UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATIONWIDE RECOVERY, INC.,
a Michigan corporation,

      Plaintiff/Counter-Defendant,

vs.

CITY OF DETROIT,

      Defendant/Counter-Plaintiff,

Case No. 2:17-cv-12378
Hon. Linda V. Parker
Mag. Jdg. Stephanie Dawkins Davis

---

CITY OF DETROIT,

      Third-Party Plaintiff,

vs.

JERRY PARKER, an individual, et al

      Third-Party Defendants.

---

**BRIEF IN SUPPORT OF (1) DEFENDANT CITY OF DETROIT'S
RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND (2) CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO PLAINTIFF'S DUE PROCESS CLAIM**

City of Detroit Law Department
Melvin Butch Hollowell, Jr.
Charles N. Raimi
2 Woodward Ave., suite 500
Detroit, Mi  48226
Phone 313 237 5037
E-mail raimic@detroitmi.gov
October 24, 2017

TABLE OF CONTENTS

STATEMENT OF QUESTIONS AND CONTROLLING AUTHORITY….

INTRODUCTION …………………………………………………..

FACTS …………………………………………………………...

    A.   Services provided by tow companies for the Detroit Police Department …………………………………...

    B.   The City's Auditor General's DPD tow audit covering April 2008 to June 2010 …………………………………..

    C.   DPD and BOPC respond to the audit by renaming the tow contracts as "tow permits," which were then issued in 2011…

    D.   The 2016 tow permits ……………………………………….

    E.   2017 events including Corporation Counsel's August 9. 2017 opinion declaring all tow permits null and void *ab initio*………

ARGUMENT …………………………………………………...

   I.   Nationwide's due process claim should be dismissed.

    A.   Nationwide's due process claim requires it to demonstrate that its 2016 permit was lawfully issued ……………………..

    B.   Nationwide's purported 2016 tow permit was issued contrary to state law, City Charter and public policy and was void ab initio ……………………………………….

      1.   The permit is void under State law …………………..

        a.   The tow permit was issued in violation of MCL 117.4s(a) …………………………………

        b.   The tow permit was issued in violation of MCL 141.1636(6)…………………………..

i

2.    The permit is void under the City charter ............

3.    The permit is void as contrary to public policy .....

II.    Nationwide's other arguments are without merit.

A.    Nationwide had no right to a hearing ..........................

B.    Nationwide has no claim for estoppel ..........................

C.    Nationwide did not have a "vested property interest." ..........

D.    Nationwide's "official record" claim is groundless ...........

CONCLUSION AND RELIEF .................................................

ii

# STATEMENT OF QUESTIONS AND CONTROLLING AUTHORITY

## STATEMENT OF THE QUESTION

Whether Nationwide can pursue a claim for violation of due process of law where it does not have a property interest, because the purported permit upon which it relies was issued in violation of state law, City Charter and public policy and is therefor void.

The City answers "no."

## CONTROLLING AUTHORITY

- *Michigan Paytel v. City of Detroit*, 2817 F.3d 527 (6th Cir. 2002).

- *Telford v. Roberts*, 2013 WL 4026835 (E.D. Mi. 2013), App. Dismissed (6th Cir, 2013), ex. 13.

- State of Michigan Financial Review Commission Act including MCL 141.1632; MCL 141.1636(6) and MCL 117.4s.

- City of Detroit Charter 4-122

iii

## INTRODUCTION

As the Court knows, the City of Detroit recently emerged from bankruptcy. Those proceedings helped the City's balance sheet and led to changes – including new state financial oversight laws - intended to help keep the City solvent.

Police towing in Detroit has historically (and improperly) been under the purview of the Board of Police Commissioners (BOPC). The BOPC acts as an oversight board for the Detroit Police Department (DPD) in matters such as police discipline. City Charter ex. 1, ¶7-802. That Charter provision does not empower the BOPC to procure tow services and there is nothing in any City ordinance which would so empower the BOPC. The BOPC has never been legally authorized to procure tow services, nor did BOPC have any expertise in procurement.

Police towing in the City has been a cesspool for many years, involving the toxic combination of largely non-existent procurement procedures with awards of purported "tow permits" that plaintiff here alleges are "quite lucrative." Plaintiff's FAC, ¶ 45. In 2011 the City's auditor general issued a scathing indictment of the BOPC's towing procurement processes citing, *inter alia*, BOPC's failure to follow proper processes including City Council approval. Ex. 2.

In response to the audit, the BOPC and its then legal advisor, the recently indicted Ceila Washington, concocted a scheme to rename the tow contracts as "tow permits." The "tow permits" were substantively identical to the prior "tow

1

contracts," but the transparent gambit allowed the BOPC to continue to evade proper procurement procedures and retain power over DPD towers.

In 2017 Detroit towing magnate Gasper Fiore was indicted. Ceila Washington resigned in disgrace shortly thereafter. Those events focused the City's administration's attention on the out-of-control procurement process which urgently needed a complete overhaul. The City's Corporation Counsel issued an opinion confirming that all 2016 tow permits were void ab initio and directing the implementation of proper procurement processes. Ex. 3.

Nationwide alleges that it holds a Constitutionally protected property interest via a 2016 "tow permit" issued by the BOPC. Nationwide paid nothing for the permit, and Nationwide has been paid for its tows by the vehicle owners or by sale of their vehicles. As shown below, the purported permit was issued in direct violation of state law, City Charter and public policy. It is void ab initio and does not and cannot confer any property right. Accordingly, the City asks the Court to deny Nationwide's motion and grant the City's cross-motion to dismiss Count I of Nationwide's complaint.

## FACTS[1]

---

[1] The City's factual recitation is supported by the declarations of Boysie Jackson, the City's Chief Procurement Officer; Lt. Michael Parish, the DPD representative who assumed oversight of tow activities in December 2016; and police officer Kenyatta
(footnote continued on following page.........................)

2

## A. Services provided by tow companies for the Detroit Police Department.

Police authorized towers perform the following services for DPD (Parish dec'l, ex 5):

**Evidence tows** are for vehicles which may be or contain evidence of a crime, for example, where the vehicle was involved with a homicide, robbery, assault or carjacking. In recent years many evidence vehicles have been stored on a private lot designated for evidence-vehicle storage. For certain crimes involving a victim, such as those connected with homicides, robbery, carjacking, or criminal sexual conduct, upon presentation of a "fee waiver" for the vehicle, the tow company did not impose any fees on the person redeeming the vehicle. The tow company submitted an invoice for $160 to the City of Detroit. The City would then pay owner of the lot a $160 fee, from which the owner paid $125 to the tower.

**Forfeiture tows** are for vehicles that have been forfeited under law, for example, where the vehicle has been used in solicitation of prostitution or the sale

---

Myers, who acts as liason between the DPD and towers. The declarations are appended as exhibits 4, 5 and 6. The factual recitation is also supported by certain documents maintained by the City in the ordinary course of business.

3

of narcotics. Historically, those vehicles have been towed to a DPD lot and the DPD has paid the tower $125.

**Police authorized tows** are for vehicles that have, for example, been involved in an auto accident and need to be towed to allow free flow of traffic and remove hazards from roadways. Historically each tower has towed vehicles to its private lot where the tower obtains its tow and storage fees directly from the owner or via disposition of the vehicle if it is not reclaimed. DPD charges the tower a $75 administrative fees for services in connection with police authorized tows.

Exhibits A and B to Parish's declaration (ex. 5) contain financial information maintained by DPD in the ordinary course of business. Exhibit A shows that during the period January 2016 – August 2017, DPD towers paid administrative fees for police authorized tows totaling $2,563,750. Exhibit B shows that during the period July 1, 2016 to September 29, 2017, the City paid to DPD towers the sum of $317,955.75 for forfeiture and evidence tows. Parish dec'l, ¶¶8-9. If extrapolated over a five year period, the term of the purported 2016 tow permits, the numbers become $7,691,250 for administrative fees and $1,271,823 for forfeiture and evidence tows.

## B. The City's Auditor General's DPD tow audit covering April 2008 to June 2010.

The City's Auditor General, in March 2011, issued its audit report on DPD tow activities covering April 2008 – June 2010. Ex. 2. DPD towers were then operating under expired "tow contracts." The Auditor General found that the BOPC had no legal right to procure tow services:

> "The original towing contracts, which were awarded in November 2001 and January 2002, did not comply with the requirements of the City's Purchasing Ordinance and were not approved by City Council, which was noted in the report of the Office of the Auditor General's audit of the DPD's Administration of the Police Authorized Towing Process that was issued September 2004. DPD concurred with the audit report finding and indicated that all future towing contracts would comply with the City's purchasing ordinance and would be approved by the City Council. In January 2005, DPD extended 27 towing contracts from January 31, 2005 until September 30, 2005. The contract extensions were not submitted to City Council for approval. In August 2005, DPD extended six of the contracts for one year without City Council approval. Currently, the contract extensions, which lack City Council approval, are being utilized on a month-to-month basis."

The audit went on to sharply criticize the entire process on many other points.

## C. DPD and BOPC respond to the audit by renaming the tow contracts as "tow permits," which were then issued in 2011.

Neither DPD nor BOPC contested the audit finding that the procurement process violated City procedures including City Council approval. Ex. 2, attachments A and B (DPD and BOPC responses). Instead, DPD and BOPC, together with BOPC's then in-house lawyer Ceila Washington, devised a strategy of renaming the contracts as "permits." DPD response, attachment A, p. 1 ("It should be noted that with the implementation of the new towing rules and regulations

5

approved by the Board of Police Commissioners concerning the towing process, only "towing permits" will be issued to qualified applicants, No contracts will be issued."). That was a transparent scheme to continue to evade proper procurement procedures and thereby retain control over procurement of towers.

The BOPC issued a proposed revised "Application Process" document dated December 15, 2010, which provided for issuance of "tow permits." Ceila Washington was the point person. Ex. 7, (notice of public hearing on BPOC proposed rules for "tow permits"). In 2011, the "tow permits" were implemented and five year "tow permits" were issued. Ex. 8 (new "tow permit" rules). But the relationship with towers created by the "tow permits" was substantively identical to the relationship under the prior "tow contracts." The "contract" and "permit" process documents are word for word almost identical. Compare exhibits 9 (BOPC tow contract rules) and 8 (BOPC tow permit rules), page by page, section by section, from page 1 to the end. The transparency of the "contract to permit" gambit is highlighted by the last sentence on page 2 of each document. The "tow contract" document states "Applicants must agree to be bound by all the terms and conditions of the Police Authorized Tower Contract with the City of Detroit." The "tow permit" sentence is identical except the word "Contract" is replaced by "Permit." And the cited "terms and conditions" of each document are substantively identical.

**D. The 2016 tow permits.**

6

In 2016, Nationwide received a new tow permit with a purported five year term. Nationwide made no payment to acquire that permit or any prior permit or contract. The permit was signed by police officer Kenyatta Myer and by the Chair of the BOPC.   There is no supporting BOPC resolution authorizing either the issuance of, or the BOPC's Chair's signature on the permits.

Nationwide argues that Officer Myer, who holds the lowest possible DPD rank (police officer), "oversaw the [2016] application and selection process * * *." Plaintiffs' brief, p. 4, citing to a BOPC meeting transcript.  The cited transcript does not support plaintiff's allegations which are wildly inaccurate.

 Officer Myers' declaration (ex. 6) denies Nationwide's unsupported assertions. Id, ¶13.  Myers was simply a liason between DPD and tow companies. Id, ¶2. There was no RFP process and Myers had no training or experience in procurement of goods and services. Id, ¶¶3-6.

Ceila Washington was employed as a legal advisor to the Board of Police Commissioners ("BOPC") in 2010/2011.  She later became legal advisor to the DPD where she served as a deputy chief.

Washington directed the 2016 permitting process: "DC [Deputy Chief Ceila] Washington, whose rank was far higher than mine [Myers], had the lead role in this [2016 application and selection] process.  To my understanding, DC Washington and the BOPC determined the procedures and made the final determination of who

was put on the tow rotation." Myers' dec'l, ex. 6, ¶14. Myers signed the permits at the direction of Washington, who then procured the signature of the BOPC chair. Id, ¶¶11-13.

### E. 2017 events including Corporation Counsel's August 9, 2017 opinion declaring all tow permits null and void *ab initio*.

On May 31, 2017, Gasper Fiore, the central figure at Boulevard & Trumbull Towing, was indicted in federal court on charges of bribery, conspiracy, mail and wire fraud. Ex. 10. Ceila Washington resigned from DPD soon thereafter while under investigation by the FBI for her DPD tow activities. Ex. 11. The BOPC removed Boulevard & Trumbull from the tow list. Ms. Washington recently was indicted for taking bribes from Gasper Fiore. Ex. 12.

In June and July 2017, DPD received information that caused it to open an investigation of Nationwide for suspected participation in car theft activity. As a result, Nationwide was removed from the tow rotation. The investigation has uncovered widespread unlawful conduct and is continuing.

Those events led the City's Corporation Counsel to examine the BOPC towing procurement process. Corporation Counsel opined that the tow permits were void ab initio, and directed the procurement process to the City's Chief Procurement Officer. A proper procurement process is now ongoing. Ex. 4, ¶15.

### ARGUMENT

8

I.   **Nationwide's due process claim should be dismissed.**

   **A. Nationwide's due process claim requires it to demonstrate that the 2016 permit was lawfully issued.**

In *Michigan Paytel v. City of Detroit*, 2817 F.3d 527 (6th Cir. 2002), plaintiff

("MPJV") bid for a city contract.  MPJV was told by Alan Miller, DPD's second

deputy chief of financial operations, that MPJV had been selected as the winning

bidder.  DPD thereafter rejected all proposals.  MPJV sued and alleged violation of

due process. The Sixth Circuit affirmed dismissal:

> "MPJV claims that the City violated its constitutional right to due process by not awarding it the contract for the DPD in-cell telephone project. To state a valid claim under § 1983, a plaintiff must show that the defendant acted under color of state law to deprive the plaintiff of a definite liberty or property interest. * * *.

> "Under the Detroit City Charter and the Detroit City Code, the Detroit City Council is charged with making most contracts for the City. Detroit City Charter § 4–122 (requiring approval by a resolution of the City Council for purchase contracts); Detroit City Code § 18–5–5 (requiring Council approval for contracts that exceed $5000 in value and all revenue contracts). It is undisputed in this case that the Detroit City Council neither approved the MPJV bid nor passed a resolution that awarded the contract to MPJV.

> MPJV therefore bases its procedural due process claim on the allegation that Miller accepted MPJV's 1995 bid on the City's behalf. As at common law, the validity of Michigan contracts depends not only on the required elements of offer, acceptance, and consideration, but also on the competency of the parties to enter into a contract. * * * Individual officers generally do not have the power to bind the municipal corporation. Furthermore, Michigan law charges those who make contracts with a municipality to know the limits of its power to contract. * * *.

"In this case, MPJV cannot prove that the City awarded it the DPD in-cell telephone contract. The City Council did not approve MPJV's 1995 bid, and Miller did not have the authority to enter into a binding contract on the City's behalf. Therefore, the plaintiffs did not have a legitimate claim of entitlement to the DPD contract." Id, 287 F.3d 527, 539, 540, citations omitted.

In *Telford v. Roberts*, 2013 WL 4026835 (E.D. Mi. 2013), app. diss. (6th Cir, 2013), ex. 13, the Detroit Board of Education, in August 2012, appointed plaintiff (Telford) interim superintendent of academics. In March 2013 the Board of Education voted to extend the contract until December 31, 2014. When the contract was summarily terminated by the DPD emergency manager a few days later, Teleford filed a due process claim. Judge Steeh dismissed the claim:

"In order to survive a motion to dismiss regarding a due process claim, plaintiff must first establish that a property interest existed in the contract between himself and the Board of Education. * * * Defendants argue that the amended contract was invalid because it fails to satisfy the elements of a contract and is contrary to public policy. This would render plaintiff's claim to a property interest in the contract void. If the amended contract was invalid, plaintiff fails to state a claim for relief regarding the Due Process Clause.

"Michigan law requires five elements in a valid contract [including] parties competent to contract * * *. Given these requirements, if a party does not have the authority to promise the terms of the contract, the contract is unenforceable. *See Sittler v. Bd. of Control of Mich. Coll. of Min. & Tech.,* 333 Mich. 681, 684, 53 N.W.2d 681 (1952) (finding provisions made by municipalities without the authority to make such promises unenforceable). Under the provisions of the revived P.A. 72, the Board did not have authority to promise plaintiff any financial compensation. * * * The Board's lack of authority to make this promise renders the contract unenforceable.

"Plaintiffs contract was also contrary to public policy. If a contract is against public policy, it is unenforceable. * * * Plaintiff's contract was signed days before defendant Roberts was to take over as emergency manager pursuant to P.A. 436. It was an obvious and deliberate attempt to avoid the statutory termination power of the emergency manager, which is contrary to public policy." Ex. 13, p. 2.

In *Superior Ambulance Service v. Lincoln Park*, 19 Mich. App. 655 (1965), Lincoln Park's police chief orally contracted with Superior to provide ambulance service for the City. The City refused to pay and Superior sued. The court of appeals rejected both Superior's contract and implied contract claims. The court quoted from *Utica State Savings Bank v. Village of Oak Park*, 279 Mich. 568, 578, 579 (1937) (internal citations omitted):

"Persons dealing with a municipal corporation through its officers must at their peril take notice of the authority of the particular officer to bind the corporation, and if his act is beyond the limits of his authority, the municipality is not bound. * * *'

"In 10 McQuillin, Municipal Corporations (3d Ed., 1966 Rev. s 29.15, pp. 269, 273 it is stated:

"'The officer, body or board duly authorized must act in behalf of the municipality, otherwise a valid contract cannot be created. * * * 'Generally, no officer or board, other than the common council, has power to bind the municipal corporation by contract, unless duly empowered by statute, the charter, or authority conferred by the common council, where the latter may so delegate its powers; * * *'"

## B. Nationwide's purported 2016 tow permit was issued contrary to state law, City Charter and public policy and was void ab initio.

## 1. The permit is void under State law.

11

The City's bankruptcy's plan of adjustment included the "Grand Bargain," whereby the state of Michigan provided roughly $200 million to the City to limit bankruptcy reductions to city employees' pensions. To ensure the City did not return to bankruptcy, the state enacted Michigan public acts 181 and 182 which took effect on June 20, 2014 (relevant excerpts attached as ex. 14). The Financial Review Commission Act ("FRC Act") provided for state oversight and required sweeping changes within the City. Jackson dec'l, ex. 4, ¶3, and see MCL 141.1632 (legislative findings).

MCL 117.4s(a) required the City to appoint a Chief Financial Officer to "supervise all financial and budget activities of the city." MCL 141.1631 et seq created the Michigan financial review commission. The commission must approve any "applicable contract," which is a contract that exceeds $750,000 or has a term longer than 2 years. MCL 141.1633(a), (definition of applicable contracts); MCL 141.1636(6), ("Notwithstanding any charter provision or local ordinance to the contrary, all applicable contracts are subject to review and approval by the commission.").

In accordance with those state laws, the Detroit Mayor, with the confirmation of City Council and the Financial Review Commission, appointed a Chief Financial Officer, John Hill. The City's administration was dramatically restructured with the intent that all financial, budget and procurement activities be within the Office of the

12

Chief Financial Officer and report up to the Chief Financial Officer. What was formerly the "purchasing division" within the "finance department" is now called the Office of Contracting and Procurement led by the Chief Procurement Officer. They are part of the Office of the Chief Financial Officer and report up to the CFO, John Hill. Jackson dec'l, ex. 4, ¶¶ 4-5.

### a. The tow permit was issued in violation of MCL 117.4s(a).

Procurement of any goods or services, including DPD towing services, is indisputably a "financial activity" required to be under the supervision of the City's CFO. MCL 117.4s(a). First, DPD tow activities implicate millions of dollars in payments between the towers and the City over the five year terms of the purported permits. Parish dec'l, ex. 5, ¶¶8-9. Those revenues and expenditures are integral to the City's overall financial condition. Ex. 15, (2015 memorandum to members of the FRC examining the City's four year financial plan including "projection of all revenue and expenditures of the city for each fiscal year").

Second, City ordinance requires that all DPD towers must be "Detroit based towers." That is to be confirmed by **"payment * * * of City income taxes on the towers profits * * *."** Ord. 55-2-82(b), (all cited City ordinances are collected in ex. 16). Nationwide's complaint alleges that the DPD tow business was "lucrative." Nationwide has alleged that it provided towing for many other governmental entities. Nationwide's place of business is in the City of Detroit. **Yet the City can find no**

13

**evidence that Nationwide or any of its owners or agents ever paid $1 in City income tax on Nationwide's profits.**

Nationwide did obtain a purported "tax clearance" based on its perfunctory filing of a City income tax return. The return reports nominal income. Nationwide's profits from its "lucrative" business evidently flowed to its owners who neither reported nor paid city tax on them. The BOPC issued the 2016 permit without conducting any examination to determine whether City income tax was actually paid on Nationwide's profits – which they most certainly were not. Such an inquiry would need to be conducted by qualified individuals within the City's finance/tax department. Nationwide's failure to pay City income tax on its profits confirms that it never qualified as a Detroit based tower even if the 2016 permitting process was legal, which it was not.

Third, improper procurement processes using faulty legal documents inevitably lead to expensive and disruptive litigation of which this case is exhibit A. This case should be compared with the City's municipal parking department's recent proper procurement of tow services through the Office of Contracting and Procurement.   That procurement used contracts approved by the Corporation Counsel and was approved by City Council. Jackson dec'l., ex. 4, ¶¶12-14.

The municipal parking department's tow contracts provide important protection to the City not in the BOPC "permit." Those protections include,

14

significantly, the right to terminate the contractor for convenience on five days' notice. That is a standard provision in City contracts. Id. Under that provision, the City summarily terminated the municipal parking tow services of both Nationwide and Boulevard & Trumbull – the companies that are now suing the City for alleged improper termination of the BOPC tow permits. Had the DPD tow procurement been properly handled, in accordance with state and city laws, proper contracts would have been issued expressly providing for termination for convenience.

Fourth, proper procurement requires broad advertisement of the service opportunity so as to obtain the most qualified bidders, together with professional vetting of the bidders. Had Nationwide been properly vetted, the City would have learned that Nationwide's legal counsel (Marc Deldin) issued the purported legal opinion appended as exhibit 17. The "opinion," which Nationwide drivers have displayed to DPD officers, claims that Nationwide was authorized to seize and tow allegedly "stolen cars" **without the presence of a police officer!** Ex. 17. That is directly contrary to DPD policy and, the City believes, has been used by Nationwide to facilitate its car theft activities. Such activities contribute to the City's crime problem which, among many other problems, led to the City's bankruptcy.

The 2016 BOPC tow permit process was handled by Officer Myers and DC Washington without the involvement of the Office of Contracting and Procurement.

15

Jackson dec'l, ex. 4, ¶10. Because that financial activity was not under the supervision of the OCFO, the resulting tow permit is void under MCL 117.4s(a).

Nationwide's brief (page 20) argues that the procurement of towing companies does not constitute a financial activity subject to MCL 117.4s. Nationwide incorrectly states that the only financial aspect of the process involved payment of administrative fees to the City. Id. The administrative fees alone implicate millions of dollars, but the tow permits **also** implicate six figure payments from the City to the towers. Parish dec'l, ex. 5, ¶¶8-9.

The broader point is that tow procurement activities are necessarily "financial activities" for the four reasons stated above. That conclusion is self-evident and any possible doubt is removed by fundamental rules of statutory construction. In *People v. Cooper*, 166 Mich. App. 638 (Mich. App. 1987), defendants were convicted for selling unregistered securities. The court broadly construed the term "security:"

> "We hold, however, that in light of the remedial nature of the legislation, the statutory policy of affording broad protection to the public, and the Supreme Court's admonitions that the definition of securities should be a flexible one, the word 'solely' should not be read as a strict or literal limitation on the definition of an investment contract, but rather must be construed realistically, so as to include within the definition those schemes which involve in substance, if not form, securities * * *." 166 Mich. App. at 648, quoting from *Securities & Exchange Comm v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476 (C.A.9, 1973), cert. den. 414 U.S. 821 (1973).

The FRC Legislation likewise is remedial legislation designed to protect the City and its citizens from the disastrous consequences of the City's pre-bankruptcy

16

policies. MCL 141.1632(h), (state oversight to "ensure that [City of Detroit does] not engage in the financial practices that led to [bankruptcy].") If there were any ambiguity whether the term "financial activity" incorporates procurement of goods and services – which the City denies – those principles are dispositive.

### b. The tow permit was issued in violation of MCL 141.1633(a) and MCL 141.1636(6).

The cited statutes require FRC approval for any contract with, *inter alia*, a term of more than 5 years. Application of the statute is illustrated by the list of 29 contracts presented by the City for FRC approval at its April 20, 2015 meeting. Ex. 15, pages 8-13. The wide variety of contracts submitted for FRC approval included intergovernmental agreements (no. 10, p. 9); agreements that involved no funding at all (no.'s 13, 14, p. 10); and contracts requiring approval only because their term was more than 2 years (no. 29, p. 13).

Nationwide's brief does not address those state statutes. Its position appears to be that the statutes do not apply because "towing permits are not contracts." Brief, p. 21. Nationwide is wrong. "A contract is defined as '[a]n agreement between two or more parties creating obligations that are enforceable or otherwise recognizable by law.'" *North Shore Injury Center v GEICO*, 2017 WL 1109900 (Mich. App. 2017), ex. 18, p. 2, quoting Black's law dictionary (10th ed.). Nationwide argues that **"printed rules and mutually explicit understandings govern the parties [City and Nationwide] conduct."** Brief, p. 12. That is the very definition of a "contract."

17

Indeed, those alleged "mutually explicit understandings" are exactly the same as when the BOPC issued purported "tow contracts." Compare ex's. 8 and 9.

This case involves a five year "permit" which, according to Nationwide, creates "mutually explicit understandings" and which purportedly allows termination only for "cause." The City submits that the statutes' requirement for FRC approval of "contracts with a term over 2 years" unambiguously required FRC approval of the "permits" at issue here. But if there were any ambiguity, the fact that this is remedial legislation, requiring consideration of substance over form, confirms the requirement of FRC approval.

Nationwide argues that the City is estopped from arguing that the permits are contracts based on prior statements of City employees. Brief, pp. 20-21. Whether the permits in question are "contracts" for purposes of the FRC legislation is a question of law to be determined by this Court. The FRC legislation would preempt any City action to evade the coverage of the legislation by renaming a "contract" as a "permit." MCL 141.1636(6), ("Notwithstanding any charter provision or local ordinance to the contrary, all applicable contracts are subject to review and approval by the commission."); and see *Ter Beek v City of Wyoming*, 495 Mich 1, 19, 20 (2014), (state law preempts any contrary city action). Finally, as shown below, estoppel cannot apply to an issue of law such as whether "permits" are "contracts."

**2. The permit is void under the City charter.**

The City Council is the legislative branch of City government. Charter ¶4-101. Section 4-122 of the 2012 City Charter states: "The City may not purchase or in any way procure property or the services of independent contractors without approval by resolution of the City Council except as provided by ordinance. * * *." Significantly, that language covers **all** procurements and not just those made via "contract."

Nationwide's sole support for the BOPC's authority to issue permits is the following language from city ordinance 55-2-82(a) (brief, p. 2):

> "The Board of Police Commissioners shall establish standards, including insurance and bonding requirements that must be met in order for a tower to qualify for police authorized tows, under this chapter, and the Police Department shall maintain a current list of such qualified towers. * * * In accordance with Section 2-111 of the Charter, the Board of Police Commissioners shall promulgate administrative rules for the Body's determination as to which towers shall be called for tows under this chapter. Such rules shall provide, as nearly as practicable, for equitable distribution of police authorized towing to all towers on the list of qualified towers."

"* * * [I]t is well settled that "[a] statute that grants power to an administrative agency must be strictly construed and the administrative authority drawn from such statute must be granted plainly, because doubtful power does not exist."" *Michigan Farm Bureau v DEQ*, 292 Mich App 106, 129 (2010). Ordinance 55-2-82(a) simply gives the BOPC the authority to "establish standards, including insurance and bonding requirements * * *." It is routine for City departments to establish standards that vendors must meet to obtain a contract relating to that department. Jackson dec'l,

19

ex. 4, ¶10. However, it is the Office of Contracting and Procurement that is responsible for procuring the services – subject to Corporation Counsel and City Council approval and, if necessary, FRC approval. Id.

Nothing in the cited ordinance even purports to empower BOPC to procure services, let alone creates an exception to the Charter's requirement of City Council approval. When the City Council intends to confer by ordinance the power to procure property and services without its approval, it does so in an explicit, unambiguous and limited fashion. For example, ordinance 18-5-21(c) provides:

> "(c) The purchasing director, without prior approval of the city council, may make, or authorize others to make, an emergency procurement when public exigencies require the immediate delivery of articles or performance of services or when there exists a threat to public health, welfare or safety under emergency conditions where prior approval of the city council would be impossible or impracticable under the circumstances; provided that: [ordinance goes on to require as much competition as practicable, immediate notice to City Council and submission of a procurement contract for City Council approval within four weeks]."

See also ordinance 18-5-21(d) which authorizes the Corporation Counsel to engage legal counsel on an emergency basis, subject to immediate notification to City Council and its approval within six weeks of the retention.

In sum, section 4-122 of the 2012 City Charter required City Council approval for procurement of tow services. The City Charter likewise required approval of the City's Corporation Counsel which was not given for the 2016 permit. Charter 7.5-

206, (Corporation Counsel's approval required for "all contracts, bonds and other written instruments in which the City is concerned * * *"). The permits were issued contrary to City Charter and are void. [2]

### 3. The permits are void as contrary to public policy.

The only possible explanation for the BOPC's change from "contracts" to "permits," in response to the Auditor General's audit, was to improperly evade City Council oversight. The permits are contrary to public policy and are void for that additional reason.

## II.   Nationwide's other arguments are without merit.

### A. Nationwide had no right to a hearing.

Nationwide argues (brief, p. 6) that it was entitled to notice and a hearing under the following language in the most recent BOPC towing rules:

> "The City reserves the right to terminate any towing permit with a tow company in the event of a breach of the towing permit or any provision of the towing permit or of these Rules provided, however, that the permit holder shall be afforded an opportunity for a hearing before the Board of [sic] Commissioners of the Board's designee prior to the effective date of any such termination." Ex. 8, p. 10.

Nationwide is wrong. Because BOPC had no authority under state law or City Charter to issue the permits, the permits are void. Any purported conditions on termination of the illegal permits are likewise void.

---

[2] Because the tow permits are clearly contracts, they are also invalid under Ordinance 18-5-21(a) which addresses contracts. Jackson dec'l, ¶9.

Moreover, BOPC had no legal authority to issue any rule such as the one above. First, determining vendor termination procedures is part and parcel of the procurement process. The entire procurement process here was unlawful under state law and city charter for the reasons stated above.

Second, the only ordinance authorizing BOPC to issue any rules expressly limits such rules to determining "which towers shall be called for tows under this chapter. Such rules shall provide, as nearly as practicable, for equitable distribution of police authorized towing to all towers on the list of qualified towers." Ord. 55-2-82(a). The ordinance does not purport to confer any authority on BOPC to dictate termination procedures for towers, let alone does it confer the explicit authority as would be required by the administrative law principles cited above

### B. Nationwide has no claim for estoppel.

Nationwide argues that because Ceila Washington stated the permits were not contracts, the City now is estoped from arguing the contrary. Brief, pp. 21-22. The argument is irrelevant because, as shown above (i) any City conduct cannot possibly limit the application of the FRC legislation, and (ii) the governing City Charter provision applies to all procurement regardless of whether a contract is involved. Nevertheless, Nationwide's estoppel claim is unsound.

The elements of equitable estoppel were set out in the case of *Tregoning v. American Community Mut. Ins. Co.,* 12 F.3d 79, 83 (6th Cir.1993), *cert. denied,* 114 S.Ct. 1832 (1994), include:

> "(1) conduct or language amounting to a representation of **material fact**; * * *
>
> "(5) detrimental and justifiable reliance by the party asserting the estoppel on the representation."

The United States Supreme Court has not definitively decided whether equitable estoppel can ever be used against a governmental body, but has emphasized that any such application would be heavily disfavored. "When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Heckler v. Community Health Services,* 104 Sup. Ct. 2218, 2223 (1984).

The Supreme Court went on to observe that "however heavy the burden might be when an estoppel is asserted against the Government, the private party surely cannot prevail without at least demonstrating that the traditional elements of an estoppel are present." Id at p. 2223. One such "traditional element" is proof of a **"definite misrepresentation of fact."** Id.

23

Here, Nationwide claims only an alleged misrepresentation of law, namely, the unsound legal opinion that the permit was not a contract. That claim fails to meet even the first element required for an estoppel.[3]

Finally, Nationwide cannot meet the other elements of estoppel including "detrimental and justifiable reliance." Nationwide does not even attempt to make such a showing in its brief.

### C. Nationwide did not have a "vested property interest."

Nationwide argues it had a "vested property interest." Brief, pp. 22-23. Nationwide cites *Detroit Edison Co. v. City of Wixom*, 382 Mich 673 (1969), where the Court stated: "Zoning laws may not deprive owners of land of vested interests therein without just compensation." The court then applied that rule to the unique facts of that case.

---

[3] Federal and state case law confirm that a government cannot be estopped by an alleged misstatement of law. "The doctrine of equitable estoppel is not a bar to the correction by the Commissioner of a mistake of law." *Auto Club of Michigan v CIR*, 353 U.S. 180, 183 (1957). "The general rule is that administrative officers of the state cannot estop the state through mistaken statements of law." *Kelso & Irwin, P.A. v. State Ins. Fund,* 134 Idaho 130, 997 P.2d 591, 599 (2000); *Rainaldi v. Public Emp. Retirement Bd.,* 115 N.M. 650, 857 P.2d 761, 769 (1993)); *Earl Township v. Reading Broad., Inc.,* 770 A.2d 794, 798 (Pa.Commw.Ct.2001), *appeal denied,* 568 Pa. 637, 793 A.2d 910 (2002); *see generally* 28 Am.Jur.2d *Estoppel and Waiver* § 142 (1966) ("In general, an estoppel cannot be asserted against a government entity based on mistaken statements of law...."). (Copies of out-of-state cases collected in exhibit 20).

24

"Mere investment in the acquisition of the land for an intended use is not sufficient to create a vested right. But where, as here, the acquisition is an integral part of a contiguous land use, (here a right-of-way), and substantial investment, (here over 6 million dollars), in a total, unitary usage has been made in good faith, including partial construction thereof, (here a partly completed high tension line), then the rights of the owner are vested, and will be protected against a subsequent prohibition of the use." Id, pp. 684-685.

This is not a zoning case and does not involve acquisition of land. Nationwide did not pay anything for its illegal permit. Nationwide has received payment for its DPD tows. The permits were void and Nationwide acquired no property right let alone a "vested" property right.

### D. Nationwide's "official record" claim likewise is groundless.

The City's brief applies the law to properly supported facts.   Nationwide's "official record" claim (brief, p. 24) is irrelevant and frivolous.

### CONCLUSION AND RELIEF

The City asks that the Court deny Nationwide's motion for partial summary judgment, grant the City's cross-motion and dismiss Count I of Nationwide's complaint.

City of Detroit Law Department
/s/ *Charles N. Raimi*

October 24, 2017

25