UNITED STATES OF AMERICA
EASTERN DISTRICT OF MICHIGAN

NATIONWIDE RECOVERY, INC.,

      Plaintiff,

vs.

CITY OF DETROIT,

      Defendant.

Case No. 4:17-cv-12378
Hon. Linda V. Parker
Mag. Jdg. Stephanie Dawkins Davis

---

## DEFENDANT, CITY OF DETROIT'S, MOTION
## TO COMPEL DISCOVERY

Defendant, City of Detroit, pursuant to Fed. R. Civ. P. 33, 34 and 37, and for the reasons stated in the accompanying brief, moves for entry of an order compelling plaintiff (Nationwide) to produce all information and documents requested in the City's first set of discovery requests served on April 23, 2021. Nationwide's responses and supplemental responses to the City's discovery requests are attached as exhibits 1 and 2 to the accompanying brief. Specifically, the City seeks the information requested in interrogatories 3 and 4, and the documents requested in document requests 3, 4, 7 and 8.

The City's counsel and Nationwide's counsel, on June 4, 2021 conferred about Nationwide's initial responses to the City's discovery requests. They reached

1

agreement that Nationwide would supplement certain of its answers to interrogatories and it has done so.

Nationwide's original responses agreed to provide documents requested in document request 3 and 8.  More than a month later Nationwide still has not done so despite inquiries by the City's counsel.  The parties were not able to agree on interrogatories 3 and 4, and document requests 4 and 7.

The City urgently needs full answers to all interrogatories, and all requested documents, to begin preparation for trial in which Nationwide will seek more than $3 million in damages and attorney fees.

City of Detroit law department
Charles N. Raimi (P29746)
/s/Charles N. Raimi
Attorney for defendant
2 Woodward Ave, Suite 500
Detroit, Michigan 48226
Tel: (313) 237-5037
raimic@detroitmi.gov

July 6, 2021

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing first set of discovery requests was served by electronic mail on all counsel of record on July 6, 2021.

/s/Charles N. Raimi

UNITED STATES OF AMERICA
EASTERN DISTRICT OF MICHIGAN

NATIONWIDE RECOVERY, INC.,

      Plaintiff,

vs.

CITY OF DETROIT,

      Defendant.

Case No. 4:17-cv-12378
Hon. Linda V. Parker
Mag. Jdg. Stephanie Dawkins Davis

---

**DEFENDANT, CITY OF DETROIT'S, BRIEF IN SUPPORT OF
MOTION TO COMPEL DISCOVERY**

**CERTIFICATE OF SERVICE**

City of Detroit law department
Charles N. Raimi (P29746)
Attorney for defendant
2 Woodward Ave, Suite 500
Detroit, Michigan 48226
Tel: (313) 237-5037
raimic@detroitmi.gov

July 6, 2021

**TABLE OF CONTENTS**

Page

Prior briefing on these issues ......................................................... 1

Background .................................................................................... 2

ARGUMENT ................................................................................. 4

    I.  Discovery that has not, or should not have been, contested ................ 4

        A. PPP loans ....................................................................... 4

        B. Towing invoices ............................................................. 4

        C. Nationwide's Towbook database................................... 6

    II.  Discovery in dispute.......................................................... 7

    III.  Evidence showing Nationwide's pattern and practices of
        illegal, and grossly excessive towing and storage charges ................ 7

        A.  Nationwide was not profitable, despite being a DPD
            authorized tower, until adopting its wrongful practices......... 7

        B.  Nationwide became profitable after adopting its
            wrongful practices ..................................................... 8

        C.  Both the Michigan trial court and court of appeals
            explicitly found grossly excessive and improper fees............ 13

        D.  The wrongdoing has been and is continuing........................... 14

        E.  Vehicle owners are effectively powerless to
            challenge towing rates ............................................... 14

    IV.  The City's requested discovery is relevant, proportional
        and critically necessary to the City's nominal (or limited)
        damages defense ..................................................... 16

V.   Additional case law supporting the relevance of the
     requested discovery ............................................................... 19

VI.  Nationwide's own damages theory make discovery into its
     wrongdoing directly relevant to its lost profits claim ...................... 22

Conclusion and Relief ............................................................... 24

Certificate of Service ............................................................... 24

**CITY OF DETROIT'S BRIEF IN SUPPORT OF MOTION**

**PRIOR BRIEFING ON THESE ISSUES**

The parties have submitted briefs in response to this Court's Order for supplemental briefing on certain issues. Those issues overlap, to some extent, the issues addressed in this brief.

However, it has become clear that Nationwide is stonewalling discovery that should not be in dispute, and the City is justly apprehensive of letting time pass without seeking Court intervention. For one example, Nationwide has refused to produce towing and storage invoices that show itemized fees for years January 1, 2018 to date. That refusal is inexplicable. There is a mutually agreeable protective Order in place. Nationwide expressly agreed to produce the invoices in its discovery responses. And Nationwide produced earlier years of such invoices in the state court litigation. The City can only conclude that the invoices remain hidden because they will show that Nationwide has continued to charge outrageous fees.

The City needs those invoices, and other basic discovery information, to begin trial preparation in a case where Nationwide will seek upwards of $3 million. Nationwide has urged a discovery plan with almost no time for discovery. In the parties' April 22 discovery plan, Nationwide proposed that discovery should close by June 15. For those reasons, the City was compelled to file this motion.

1

## BACKGROUND

Nationwide operates a towing business. In past years it was an authorized Detroit Police Department (DPD) tower, which allowed it to tow vehicles for DPD (Nationwide was also free to serve other customers). On July 17, 2017, DPD terminated Nationwide's tow permit believing that Nationwide or its employees had colluded with car thieves. This Court held that the termination denied Nationwide of due process of law. The City respectfully disagrees with the Court's due process analysis but that is not at issue here.

This case was held in abeyance while the City pursued a state court nuisance action against Nationwide. The Wayne County Circuit Court held that Nationwide's corrupt relationship with the Wayne County Sheriff created a public nuisance by preventing the DPD from investigating thousands of car thefts and other serious crimes. Ex. 14, Judge Colombo's bench opinion. A permanent injunction was entered, ex. 15, and the Michigan Court of Appeals affirmed. *City of Detroit v Nationwide Recovery, Inc*, 2021 WL 1051247 (Mich App). The Court of Appeals labelled Nationwide's conduct "corrupt." *Id* at *9.

Although not relied on for entry of the injunction, the following facts emerged in the state court litigation. At least one of Nationwide's employees colluded with and paid known car thieves to obtain tips on when and where to recover stolen vehicles. Those and other stolen vehicles were towed to Nationwide's lot where

2

Nationwide routinely charged grossly excessive, fraudulent and unlawful storage and towing fees. Ex. 14, Colombo opinion, p. 41, ("no question Christian [a/k/a/ Turbo] was receiving tips from a known car thief"); p. 45 (Nationwide charging fees "significantly more than allowed"). As shown below, the fees were typically at least twice as high – and often much more - as the fees allowed by DPD and Wayne County, for whom Nationwide provided towing services.

Nationwide contends it is entitled to recover damages for the period after the DPD's permit termination on July 17, 2017 until expiration of the permit in 2021 (precise date in dispute). The Jury in this case will be asked to determine Nationwide's compensatory damages.

Nationwide's amended disclosures compute its compensatory damages at roughly $2.7 million. Ex. 3, p. 2. Nationwide evidently will claim more than $500,000 in attorney fees, bringing its claim well in excess of $3 million.

To defend Nationwide's $3+ million claim, the City seeks discovery into the full nature and extent of Nationwide's wrongdoing for two critical purposes: <u>First</u>, the City contends that despite the denial of due process, Nationwide's wrongdoing fully supported termination of Nationwide's tow permit either on July 17, 2017 or soon thereafter. As a result, Nationwide should recover an award of only nominal damages. The parties recently filed supplemental briefs on that issue.

<u>Second</u>, Nationwide's wrongdoing is directly relevant to the Jury's computation of compensatory damages. Nationwide's portion of the parties' discovery plan explains that Nationwide, in asking the Jury to compute its damages, will rely on unlawful "profits" resulting **from its own wrongdoing** – including charging of grossly excessive, fraudulent and unlawful fees. Ex. 11, p. 2, discussed later in this brief.

Nationwide has opposed issuance of City subpoenas to its governmental customers. The parties have filed supplemental briefs on that issue which are pending before the Court. But while preserving its right to pursue such discovery, this motion seeks discovery **only** from Nationwide, **not** its customers.

## ARGUMENT

### I. Discovery that has not, or should not have been, contested.

### A. PPP loans.

In response to interrogatory 7, Nationwide disclosed that it had received two PPP loans. Document request 8 seeks all application documents for those loans and all related documents. Nationwide's May 24 responses, ex. 1, agreed to produce those documents, but nothing has been produced.

### B. Towing invoices.

In response to City document request 3, Nationwide agreed to produce towing and storage invoices from January 1, 2018 forward. Ex. 1, p. 5. Nationwide had

produced thousands of invoices (through December 2017) for the state court case. There clearly was no basis to oppose production in this case and, in fact, Nationwide agreed to produce them.

These invoices are critical to the City's case. Four invoices (out of thousands of similar examples produced by Nationwide in the state court case) are appended as exhibit 4. Each invoice provides important information about the vehicle recovery including the date and time the vehicle was recovered, the vehicle information number (VIN), where it was recovered and the make and model. Each invoice also includes the identity of Nationwide's governmental customer ("account") authorizing the tow and **an itemization of towing and storage charges**.

For example, page 1 of exhibit 4 shows that the vehicle tow was authorized by the Wayne County Sheriff. It shows itemized towing and storage charges that total $1,685.

Although Nationwide expressly agreed to produce itemized invoices for January 1, 2018 forward, **it did not do so.** On June 28, the City received Nationwide's supplemental discovery responses together with its initial document production. **No itemized invoices were produced.** Instead, Nationwide produced only carefully excerpted **portions** of invoices, a few examples of which are collected in exhibit 5.

Each line item in the exhibit 5 documents represent a vehicle tow. But unlike the actual invoices, the exhibit 5 documents do not identify where the vehicle was recovered, the VIN or the vehicle make and model. And these documents do **not** provide an itemization of the invoice charges.

After scanning the June 28 document production, the City's counsel sent an email to Nationwide's counsel. Ex. 6. The City's counsel pointed out that many 2018 invoices appeared to be missing. Counsel also pointed out that there was no itemization of the charges. Counsel's email asked that Nationwide advise immediately if it was going to produce the full invoices it had agreed to produce. No response has been received.

As stated, Nationwide previously provided its actual invoices for 2016 and 2017. Nationwide in this case waived any objection to production of the invoices. And, as discussed further below, the actual invoices are critical to the City's case.

**C. Nationwide's Towbook database.**

In addition to the individual paper invoices, Nationwide contracts with a firm called "Towbook" to maintain a comprehensive electronic database with information about all of Nationwide's tows. It contains a variety of information in addition to what appears on the invoices. For one example, it identifies the Nationwide tow driver that picked up the vehicle.

The City's document request 7 asked Nationwide to produce its Towbook database for the period January 1, 2018 to date. Nationwide objected, but the boilerplate objections make no sense on their face.  The Towbook database was produced for the state court litigation. There is no conceivable reason the database information for January 1, 2018 to date should not be produced.

## II.      Discovery in dispute.

The discovery in dispute consists of interrogatories 3 and 4 and document requests 3 and 4.  As discussed above, Nationwide has waived any objection to document request 3 which seeks the towing invoices.  But the discussion below further explains why such invoices are directly relevant to this case.

The discovery seeks information concerning Nationwide's contractual relationships with its governmental customers.  The state court case revealed that Nationwide charged fraudulent fees that were far above those allowed by the Detroit Police Department (DPD) and the Wayne County Sheriff. Based on Nationwide's very limited document production in this case, it appears clear that Nationwide has continued those wrongful practices with its other governmental clients.

## III.     Evidence showing Nationwide's pattern and practice of illegal, fraudulent and grossly excessive towing and storage fees.

### A. Nationwide was not profitable, despite being a DPD authorized tower, until adopting its wrongful practices.

Nationwide was originally owned 50/50 by Jerry Parker and Victor Martin. Victor Martin separately owned and operated Martin's Towing.  In late 2015 or early 2016, the Husseins acquired Martin's 50% interest in Nationwide. At that time and for many years prior, Nationwide was a DPD authorized tower.

When asked "did the Husseins buy you out [buy out Martin's 50% interest in Nationwide]", Martin testified "I pretty much gave it to them.  I just walked away." When asked if he had examined Nationwide's books and records before the sale, Martin testified "No, I just know it was in the red."   When explaining his "aggravation" with his partnership with Jerry Parker, Martin testified "Would you want to be partners with somebody that they're losing their ass?"  Martin dep, ex. 16, pp. 60-61.

### B. Nationwide became profitable after adopting its fraudulent practices.

After Louay assumed control, Nationwide adopted its wrongful business practices:

**DPD.**   The City of Detroit and DPD strictly regulated the fees that DPD authorized towers could charge. City ordinance 46-2-81 et. seq. (exhibit 9) created the towing rate commission to establish permitted fees for DPD towers. Section 46-2-83 provides "No person performing police authorized towing or storage service * * *shall charge fees in excess of the rates set by resolution of City Council."

8

Exhibit 9(A) sets forth the schedule of authorized fees adopted by City Council: "[A] **flat rate** of $125.00 for the towing of any vehicle less than 10,000 pounds * * *." "**This rate shall apply regardless of the time and the equipment used during such tows.**"  A storage charge of $15/day. A $75 administrative fee charged to the vehicle owner and remitted to the City. Exhibit 9(A), p. 4 to exhibit 9, emphasis added.

Nationwide's due process claim in this case relies on of the Board of Police Commissioners' rules which are attached as exhibit 7, including the language at pages 10-11 providing for a hearing before termination.  Consistent with the City ordinances quoted above, the following appears at page 5 of the BOPC rules:

> "The Department will provide signage to each tow company (at the tow company's expense) which must be conspicuously displayed and easily visible at each storage lot, yard or garage which expressly states the following: * * *

> "Schedule of all approved towing, storage and additional charges as specified by the City.  [Footnote – "The entire schedule of charges should appear on the customer's copy of receipt."] **Tow companies are expressly prohibited from charging any fee or cost in excess of that specifically authorized by the City.**" Ex. 7, p. 5, emphasis added.

A facsimile of the required fee schedule sign is appended as exhibit 8.

In his deposition in the state case, Louay testified that Nationwide had a "Big sign in the office: 125 DPD [tow] rates, 75 admin fee, $15 a day storage." But Louay claimed that he could charge for alleged "additional service." He "explained" that if you get a haircut and a shave, you have to pay for both. Ex. 10, p. 41.

9

In the state court trial, Louay reversed his position: Judge Colombo's opinion states: "During the City of Detroit pilot program [which briefly authorized "hunting" under strict rules that Nationwide did not follow], Louay knew that Nationwide charged more than what was authorized by the Detroit ordinance. He only refunded the amounts if someone complained." Ex. 14, pp. 25-26, 45-46. The City has not seen evidence that $1 was ever refunded.

When Nationwide recovered a stolen vehicle as a DPD authorized tower, Nationwide collected the towing and storage fees directly from the vehicle owner. DPD did not receive a copy of the invoice. DPD would not know, in the ordinary course, that Nationwide was charging unauthorized fees - particularly when Nationwide had a "big sign" advising that it was charging proper fees.

 Based on complaints beginning in early 2017, Lt. Parish conducted a 2018 audit. The audit was delayed by DPD's lack of resources. DPD then learned that Nationwide routinely charged fraudulent fees amounting to hundreds of dollars more per tow than allowed by the governing City ordinance. The ordinance limits fees to $125 for towing, a $75 administrative fee and $15 per day storage. So, for a tow and two days storage, the fee would be limited to $230.

Exhibit 12 is one page of Lt. Parish's accounting of Nationwide's fees for DPD authorized vehicle tows during June and July 2017.  Those dates are

immediately prior to the termination of Nationwide's towing permit on July 17, 2017.  Of the 27 entries on that page, only 5 complied with the authorized rates.

Consider entry 1780774 circled on the left side of the page.  Nationwide claimed 15 days of storage but, rather than charging the allowed $15/day, Nationwide charged **$20/day** resulting in total storage fee of $300 rather than the allowed $225.

The allowed "flat rate" tow fee is $125.  Nationwide charged a "basic" fee of **$225** - $100 over the allowed flat rate - and then **added** another **$225** for fraudulent and unlawful "gate fees," "loader fees" and "wrap fees." A "gate fee" essentially is a fee for a Nationwide employee someone to push a button and raise the yard gate to allow the vehicle owner to drive out of Nationwide's lot, or allow a tow truck (not Nationwide's) to tow an owner's vehicle off the lot.  Nationwide routinely charged a "loader" fee, the "service" for which was indistinguishable from the towing fee. Such charges were expressly outlawed by the requirement of a "flat rate" towing fee. Nationwide also often charged a "wrap" fee – even if the vehicle owner never requested a "wrap."  That "service" involved a few dollars of "wrap" and a few minutes of an employee's time. These fraudulent and unlawful fees typically inflated a tow fee – limited to $125 – to $500 or more.

The required $75 administrative fee is charged by the tower to the vehicle owners - but is required to be remitted by the tow company to the City of Detroit.

The fee covers the City's costs in dealing with recovery of stolen vehicles. Nationwide charged a **$175** administrative fee. Nationwide remitted $75 to the City and **stole from the vehicle owner the $100 difference.**

Ex. 13 is Captain Parish's declaration.  It confirms that Louay, by posting a "big sign" purporting to charge only authorized rates, fraudulently concealed, prior to July 2017, Nationwide's wrongful and fraudulent charges for DPD tows.  Absent the fraudulent concealment, Nationwide's permit would have immediately been terminated long prior to July 17, 2017. *Id.*

**Wayne County Sheriff**.  Nationwide towed stolen vehicles for the Wayne County Sheriff until the Wayne County Circuit Court found that the corrupt relationship created a public nuisance and permanently enjoined the conduct. Ex. 14. Martin's Towing held the prime contract and Nationwide obtained a "subcontract."

Both Martin's and Nationwide were required to charge "reasonable rates based upon industry standards."  Victor Martin testified those rates were: $100 per tow, $75 administrative fee, and $15/day for storage - almost identical to the City ordinance rate.  Under both, towing and several days of storage should cost roughly $150 without the $75 administrative fee.

But both before and after July 17, 2017, Nationwide routinely charged each vehicle owner hundreds of dollars above the contractually limited fees. Exhibit 4, pages 1 and 2 contains two of literally thousands of examples, showing "tow/hook"

and "loader" fees which fraudulently duplicate the "recovery" fees, as well as the fraudulent "window wrap" and "gate fees" discussed above.  For towing alone – without consideration of administrative or storage fees – the 4 attached invoices show towing fees of $850, $850, $800 and $850.

**Michigan State Police.** The City seeks in discovery the MSP/Nationwide contract. But exhibit 4, pp. 3 and 4, shows the same exorbitant and fraudulent fees on tows for MSP.  And regardless of any contract terms, the extra fees are for no additional services and, hence, fraudulent and unreasonable.

### C. Both the Michigan trial court and court of appeals explicitly found grossly excessive and improper fees.

Judge Colombo was disgusted with the conduct of both Nationwide and the Wayne County Sheriff:

> "Moreover, it is astounding to this Court that no one in the Wayne County Sheriff's Department cares about the tow charges of Nationwide, which are significantly more than allowed under the contract with Martin Towing Inc. and the subcontract that Martin Towing In. has with Nationwide." Ex. 14, p. 45.

The court of appeals was equally disgusted:

> `     "The record evidence demonstrated that, under the direction of Louay, Nationwide systematically engaged in a highly aggressive car-recovery business model in plaintiff city, actively "hunting" for stolen, "suspected" stolen, and "abandoned" vehicles. In doing so, it charged far-above-market rates—requiring citizens to pay in cash to redeem impounded vehicles—while offering cash incentives to its drivers based on the volume of vehicles recovered." *COD v Nationwide, supra*, at \*9.

13

**D. The wrongdoing has been and is continuing.**

As mentioned above, Nationwide produced only carefully limited excerpts of towing invoices rather than producing actual invoices disclosing all itemized fees. Exhibit 5 has several pages of those invoice summaries.

As shown above, Both Detroit and Wayne County established roughly $150 as a reasonable fee for a tow and several days of storage. Exhibit 5 does not provide itemized fees. Nevertheless, it shows that Nationwide routinely billed towing and storage charges well in excess of $400, and often far more, in its tows for its governmental customers. Those customers are the Wayne County Sheriff, the Michigan State Police, Wayne State University and the City of Hamtramck.

Over the years Nationwide has collected millions of dollars of fraudulent and illegal fees. Sadly, due to Michigan's tower friendly laws, there is no way to recoup any of them.[1]

**E. Vehicle owners are effectively powerless to challenge towing rates.**

Towers have a strong lobby in Michigan.  Michigan law makes it almost impossible to challenge abusive towing and storage rates.

---

[1] Judge Colombo's February 2019 Final Judgment permanently enjoined Nationwide from working with the Wayne County Sheriff in recovering stolen or suspected stolen vehicles. Ex. 14. Exhibit 5 shows that Nationwide continues to tow for the Sheriff and, it appears, continues to charge outrageous fees.

The Byzantine process for challenging tow fees is set forth in MCL 257.252a, e and f. The process requires the vehicle owner – after learning of the fees - to file a petition in district court to challenge the fees. The court is required to hold a hearing within 30 days.  MCL 257.252f(1).  However, if the owner wants to get the car back before the hearing, the owner must either pay the full billed towing and storage charges to the tower, plus a $40 court fee, or the owner must post a bond with the court in the same amount.  MCL 257.252a(6).

At the hearing, the district court makes a determination whether the fees are "reasonable" or "unreasonable."  MCL 257.252f(3)(d), (e).  If "unreasonable," the vehicle owner receives a refund of the excess.

It is too obvious for words that the average vehicle owner has no ability to pursue this process. The owner needs to retrieve her vehicle immediately for work or daily life. And after a trip to the impound yard and learning the bad news about the fees, the average owner cannot take off 2 or 3 days of work to try and figure out how to file court papers, attend a court hearing, etc.[2]

---

[2]Nationwide has argued that the Michigan Attorney General could bring a lawsuit under the Michigan Consumer Protection Act for injunctive relief with respect to a tower's unreasonable fees. ECF No. 187, p. 4, fn. 4. That is not correct.  Neither the Attorney General not vehicle owners have any recourse under the Michigan Consumer Protection Act, because the "general transaction [towing and challenging tow charges] is specifically authorized by law." *Liss v Lewiston-Richards, Inc.* 478 Mich 203 (2007).

**IV.    The City's requested discovery is relevant, proportional and critically necessary to the City's nominal (or limited) damages defense.**

This Court previously asked the parties to brief the following question:

"May a jury consider evidence of pre-termination conduct and/or post termination conduct, acquired after the termination decision, when deciding whether and to what extent compensatory damages [awarded for a due process violation] may be limited?

The City answered the Court's question as follows:

The jury in this case would be allowed to consider both. In the employment context, *McKennon v Nashville Banner*, 513 U. S. 352 (1995), allows consideration of **pre**-termination conduct; *Jones v Nissan North America*, 438 Fed. Appx. 388 (2011), allows consideration of **post**-termination conduct; in each case where such evidence was acquired **after** the termination. *Jones* did not allow the jury in that case to consider plaintiff's post-termination wrongful conduct (accepting employment while allegedly disabled) because Nissan's wrongful discharge of Jones forced Jones to find work to feed his family. Obviously, nothing like that is present in this case.

Under the above-cited Sixth Circuit law, the jury in this case would be allowed to consider after-acquired evidence of Nationwide's pre-termination and post-termination conduct. Nationwide should have been terminated long before July 17, 2021 based on its fraudulent and unlawful fees.

Nationwide has never cited any due process case, and the City has found none, purporting to prohibit consideration of after-acquired evidence of the

16

plaintiff's wrongdoing, let alone in a case involving these egregious facts. On the contrary *McKennon* provides significant support for the City's common sense position.

In discussing *McKennon*, Nationwide has argued "The ADEA, Title VII, and the ADA created substantive federal rights * * *, but §1983 `merely provides a method for vindicating federal rights elsewhere conferred.'" ECF No. 185, p. 2. The City agrees. In *McKennon*, even though important substantive federal rights (under ADEA) were involved, 513 U.S. at 357-360, the Supreme Court recognized that plaintiff's wrongdoing – even though unconnected to the termination - had to be taken into account by cutting off damages:

> "Our inquiry [after discussing the important purposes served by ADEA] is not at an end, however, **for even though the employer has violated the Act, we <u>must</u> consider how the after-acquired evidence of the employee's wrongdoing bears on the specific remedy to be ordered.** Equity's maxim that a suitor who engaged in his own reprehensible conduct in the course of the transaction at issue must be denied equitable relief because of unclean hands, a rule which in conventional formulation operated *in limine* to bar the suitor from invoking the aid of the equity court * * * has not been applied where Congress authorizes broad equitable relief to serve important national policies. * * * That does not mean, however, the employee's own misconduct is irrelevant to all the remedies otherwise available under the statute. * * * In giving effect to the ADEA, we must recognize the duality between the legitimate interests of the employer and the important claims of the employee who invokes the national employment policy mandated by the Act. **The employee's wrongdoing <u>must</u> be taken into account, we conclude, lest the employer's legitimate concerns be ignored.** * * * In determining appropriate remedial action, the employee's wrongdoing becomes relevant not to punish the employee, or out of concern "for the relative moral worth of the parties," * * * but to take due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing.

"The proper boundaries of remedial relief in the general class of cases where, after termination, it is discovered that the employee has engaged in wrongdoing must be addressed by the judicial system in the ordinary course of further decisions, for the factual permutations and the equitable considerations they raise **will vary from case to case.** * * *. 513 U.S 352, 360 – 362, citations omitted, emphasis added.

Nationwide has argued that the above-quoted language only allows consideration of the plaintiff's wrongful conduct in the context of a claim for equitable relief. But the doctrine was applied in *McKennon* to limit plaintiff's compensatory damages.

In *Carey v Piphus,* 435 US 247, 255 (1978), the Supreme Court held that a plaintiff who was denied due process was entitled only to "*compensation* for the injury caused by the breach of duty." Emphasis in original. The Court observed that such compensation should be consistent with the common law principle "that a person should be **compensated _fairly_** for injuries caused by the violation of his legal rights." Id at p. 257, emphasis added. The Court continued at page 258, "In those [§ 1983] cases, the task will be the more difficult one of adapting common-law rules of damages to provide **_fair_ compensation** for injuries caused by the deprivation of a constitutional right." Those considerations led the *Carey* Court to conclude that if the plaintiff school childrens' suspensions were merited, they would be entitled only to nominal damages. Any other award would constitute "**a windfall, rather than compensation** * * *." *Id* at p. 260, emphasis added.

18

Here, the City will argue to the jury that Nationwide's termination was fully justified long before July 17, 2017, based on its routine charging of fraudulent and unlawful fees. Nationwide's termination was mandated by the above quoted provision from the BOPC rules (ex. 7, p. 5) – the very same rules upon which Nationwide relies for its due process claim. Nationwide fraudulently concealed its wrongful behavior from the public and the DPD by posting a "big sign" with the authorized fees – while actually charging wholly unlawful and fraudulent fees.

Any recovery more than nominal damages would not constitute "fair compensation," because Nationwide's entire corrupt business model made it unqualified at all times to act as a DPD tower. Any such award would be a windfall to Nationwide and punishment to the City and its residents and taxpayers. Nominal damages is the appropriate remedy.

In sum, the City needs the contested discovery to advance two key arguments: (1) wrongdoers such as Nationwide should not be allowed to use a due process violation to achieve a windfall recovery when its wrongful conduct – had it not been fraudulently concealed – would have disqualified Nationwide from serving as a DPD authorized tower; and (2) wrongdoers such as Nationwide should not be allowed to profit from its own wrongdoing.

V.     **Additional case law supporting the relevance of the requested discovery.**

"The principle that a wrongdoer shall not be permitted to profit through his own wrongdoing is fundamental in our jurisprudence." *Perma Life Mufflers, Inc. v. International Parts*, 392 U.S. 134, 151 (1968), (Justice Marshall concurring). See also *McKennon*, *supra*.

That fundamental principle has been recognized in the Sixth Circuit and elsewhere in a variety of contexts. See, e.g., *William Beaumont Hospital v. Federal Ins. Co,* 552 Fed. Appx. 494, 501 (6th Cir. 2014), (recognized but not applied in an insurance dispute).  The doctrine was applied in *In re Berry Estates, Inc*, 49 B.R. 1002 (Bankr. S.D.N.Y. 1985), affirmed 812 F. 2d 67 (1987).  There, the Court agreed with the State of New York's position:

> "The State asserts that the debtor should not be allowed to profit from its own wrongdoing and keep the excess rents collected in violation of state court escrow orders by using the Bankruptcy Code as a sword so as to be able to do what no other landlord in Spring Valley is able to do, simply because the debtor filed a Chapter 11 petition." 49 B.R. 1002, 1005.

In *Clubspecialists Intl v Keeneland Hospitality*, 2018 WL 2050134 (E.D.Ky.), the Court explained that the cited doctrine (prohibiting a wrongdoer from profiting from its own misconduct) gave rise to the "first breach" rule – where the first party to breach a contract is prohibited from suing the other party for damages.  The Court held the doctrine barred plaintiff's contract claim. *Id* at *3.  In *Carruthers v. Flaum*, 365 F. Supp. 2d 448, 470 (S.D.N.Y. 2005), the court found that a plaintiff could not

recover lost profits for a tortious interference claim, where the claim was based on the operating agreement for a casino that was operating unlawfully.

In *AlphaMed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1348 (S.D. Fla. 2006), the court held that "[i]t is beyond dispute that [a plaintiff] cannot recover lost profits that are 'predicated on the completion of illegal activity.'" (citing *Carruthers*, 365 F. Supp. 2d at 470). The court determined that because a "key component" of plaintiff's company's business plan was marketing products containing an ingredient banned by federal law, damages could not be awarded for lost profits.

In *Gillmor v. Wright*, 850 P.2d 431, 438 (Utah 1993), the court held that "[n]o legal damages flow from the inability to engage in an unlawful activity." The court determined that plaintiffs could not recover damages for a claim against a property owner to allow access to property on which they had sold permits to hunt, because hunting on the property was prohibited by local ordinance.

The rule has also been applied in determining compensatory damages. *Dethloff v. Zeigler Coal Co.*, 82 Ill. 2d 393, 412 (Sup. Ct. Ill., 1980), ("To apply this artificial standard arbitrarily [computing damages without regard to defendant's wrongdoing] would obviously allow the defendant to profit by its own wrongdoing.")

21

This maxim fully supports limiting Nationwide to recovery of only nominal damages for the due process violation. Nationwide should not be allowed to use due process as a sword to sue for additional millions of dollars in "lost profits" premised entirely on Nationwide's fraudulent fees and other wrongful practices.  The City needs the requested discovery to make these arguments to the jury.

### VI.    Nationwide's own damages theory make discovery into its wrongdoing directly relevant to its lost profits claim.

As quoted above, Nationwide has explained its damages as follows:

"Nationwide's damages are substantial.  After the City's unconstitutional termination, **Nationwide remained profitable and, importantly, had the excess capacity to perform under its towing permit without additional labor, equipment, or real estate expenses.** Diesel and "wear and tear" are the only additional costs Nationwide would have incurred to tow for the City.  These expenses are minimal and, at most, a few dollars per tow." Emphasis added.

The City intends to argue to the jury that Nationwide was "profitable" with "excess capacity" precisely because of the millions of dollars it took in via its fraudulent billings and other wrongful business practices. Nationwide wants to use its own wrongful and fraudulent conduct – conduct that has already wrongfully enriched Nationwide by millions of dollars – as the basis for its $2.7 million "lost profits" claim. Nationwide's own statement of how it intends to prove damages makes its invoices and customer information directly relevant.

The City seeks in discovery all of Nationwide's invoices for tows generated for all of its governmental customers. The City expects those documents will show

that Nationwide routinely billed fraudulent fees for towing services for all of its governmental customers. The City also seeks Nationwide's contracts with its customers to determined allowed fees.   However, regardless of any contract provision, Nationwide has no legal basis to charge unreasonable or fraudulent fees.

Nationwide chose to file this lawsuit and is pursuing millions of dollars in damages. The customer information is directly relevant to the City's defense of Nationwide's damages and due process claims.

Nationwide has objected to the City's issuance of subpoenas to Nationwide's governmental customers.   No such subpoenas have been issued and the Court is considering supplemental briefs on the issue. But this motion seeks discovery **only** from Nationwide, so that concern is not currently at issue.

Proving that Nationwide's fees and business model are rotten to the core is not collateral to this case; it is central and crucial to the City's defense if the damages issue reaches the jury. The jury will need to understand that Nationwide's "profits" were not merely "inflated" because of occasional wrongdoing, but rather, such wrongdoing was fundamental to Nationwide's business model.

Moreover, if the City is not allowed discovery, Louay Hussein will be free to prevaricate as to why he charges the fees he does and how they allegedly are "legitimate." Louay did that in his state court deposition, claiming that he was simply charging for both a "shave and a haircut."   The truth as to Nationwide's corrupt

practices and corrupt relationship with the Sheriff emerged only after discovery

directed to Wayne County and the Sheriff, together with depositions and trial

testimony of their employees and agents in the nuisance case. Judge Colombo was

rightfully disgusted, as was the Michigan court of appeals.

## CONCLUSION AND RELIEF

For the foregoing reasons, the City asks that Nationwide be ordered to produce

all information requested in City interrogatories 3 and 4, and all documents

requested in City document requests 3, 4, 7 and 8.

City of Detroit law department
Charles N. Raimi (P29746)
/s/Charles N. Raimi
Attorney for defendant
2 Woodward Ave, Suite 500
Detroit, Michigan 48226
Tel: (313) 237-5037
raimic@detroitmi.gov

July 6, 2021

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing first set of discovery requests
was served by electronic mail on all counsel of record on July 6, 2021.

/s/Charles N. Raimi