UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATIONWIDE RECOVERY, INC.,
JERRY PARKER, HUSSEIN M. HUSSEIN,
LOUAY M. HUSSEIN, ANNIE HUSSEIN,
JULIA HUSSEIN, and CAROL HENDON,

        Plaintiffs,                              Case No. 17-cv-12378
                                                    Honorable Linda V. Parker

v.

CITY OF DETROIT,

        Defendant.
_____/

## **OPINION AND ORDER**

This lawsuit, brought pursuant to 42 U.S.C. § 1983, arises from the termination of a towing permit issued by Defendant City of Detroit ("City") to Plaintiff Nationwide Recovery, Inc. ("Nationwide). As the termination was made without a pre-deprivation hearing, the City violated Nationwide's Fourteenth Amendment procedural due process rights. (*See* ECF No. 119.) Since the Court reached that conclusion in an opinion and order entered August 21, 2018, the parties have been litigating the issue of damages. On May 4, 2023, this Court granted the parties leave to file additional dispositive motions on that issue, with a filing deadline of June 1, 2023.

The matter is now before the Court on the following motions:

- The City's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (ECF No. 211), to which Nationwide responded (ECF No. 216) and the City replied (ECF No. 225);

- Non-Party Kenneth Christian's motion to quash subpoena and for a protective order (ECF No. 214), to which the City responded (ECF No. 215)) and Christian replied (ECF No. 219);

- Nationwide's motion to strike a paragraph from the declaration of Commander Michael Parish[1] (ECF No. 218), which was submitted in support of the City's summary judgment motion (ECF No. 211-2), to which the City responded (ECF No. 223) and Nationwide replied (ECF No. 226);

- Nationwide's motion for leave to file a motion for partial summary judgment (ECF No. 222), to which the City responded (ECF No. 227) and Nationwide replied (ECF No. 228).

## I.  Motion to Strike (ECF No. 218)

The Court begins with Nationwide's motion to strike paragraph 12 of Commander Parish's declaration, as that informs what facts will be considered in deciding the City's summary judgment motion.  *See Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 667 (6th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)) ("Generally, a district court should dispose of motions that affect the record on summary judgment before ruling on the parties' summary judgment motions.").

In paragraph 12 of his declaration, Commander Parish states:

---

[1] Parish was a Lieutenant when Nationwide's towing permit was suspended.

>Nationwide's conduct was both fraudulent and a blatant violation of the BOPC [Board of Police Commissioners] rules which incorporated the City Council fee schedule.  It merited immediate termination.  It is my belief Nationwide's permit would have been terminated prior to July 19, 2017, had it not misrepresented its activities by publicly posting a conforming fee schedule that alleged it was charging proper rates.

(ECF No. 211-2 at PageID. 6590-91.)  Nationwide asks the Court to strike this entire paragraph.  As to the first sentence, Nationwide maintains that it lacks specificity and, in any event, would not be based on Commander Parish's personal knowledge.  Nationwide argues that the second sentence should be stricken because: (1) a declarant's "belief" cannot be used on a summary judgment motion; and (2) Commander Parish lacks personal knowledge of whether the City would have terminated Nationwide's permit as the ultimate decision of whether to terminate a towing permit belongs to the BOPC.

Rule 56 provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Commander Parish sets out admissible facts in his declaration and, contrary to Nationwide's assertion, what misconduct he is referring to in the first sentence of paragraph 12 is clear when the declaration is read as a whole.  It obviously is not the simple posting of the City's

3

mandated fee schedule.  Rather, it was the charging of "unlawful and fraudulent fees" which exceeded those permitted under the Towing Rules and listed on the posting, including an administrative fee exceeding the $75 owed to the City, with Nationwide pocketing the excess.  (*See* ECF No. 211-2 at PageID. 6590- ¶¶ 9-11.) There can be no dispute that Commander Parish had personal knowledge of these charges from the audit of Nationwide.

Commander Parish uses the word "belief" when conveying that Nationwide's permit would have been terminated based on this misconduct. However, this Court must look beyond the words used to assess whether Commander Parish's statement "is based on personal testimony and competence[.]"  *Ondo v. City of Cleveland*, 795 F.3d 597, 604 (6th Cir. 2015) (indicating that it is not the use of "magic words" but whether the "court can conclude from the context of the declaration whether [the personal knowledge and competence] requirements are satisfied").  The fact that the BOPC had the final authority to terminate a towing permit does not mean that Commander Parish is unable to indicate, based on his personal experience and knowledge, what that decision would have been.  And the City demonstrates that Commander Parish possesses this personal experience and knowledge.  (*See generally* ECF No. 223-2.)

4

For this reason, the present case is distinguishable from *Nagel v. United Foods*, 63 F.4th 730, 735 (8th Cir. 2023), which Nationwide cites.  There, the issue was whether the plaintiff-union member could attest to how 119 other members (many if not all of whom presumably were strangers to him) would have voted on a collective bargaining agreement if the union had not concealed key information.  Commander Parish, in comparison, has years of experience supervising the City's towing operations and engaging with the BOPC, including becoming familiar with its decisions.  (*See generally* ECF No. 223-2.)

For these reasons, the Court is denying Nationwide's motion to strike paragraph 12 of Commander Parish's declaration.

## II.     Motion to Quash (ECF No. 214)

Kenneth "Turbo" Christian was a Nationwide employee in July 2017, towing abandoned and stolen vehicles, including pursuant to Nationwide's permit with the City.  Christian's involvement in the recovery of a stolen Jeep Cherokee in mid-July 2017, added to the City's already existing suspicions that Nationwide's rate of recovering vehicles—which far exceeded that of other City towers—resulted from its collusion with car thieves.  This led to Commander Parish's recommendation to then City Police Chief, James E. Craig, that Nationwide's towing permit be immediately suspended.

Christian was interviewed by the Detroit Police Department ("DPD") on March 2, 2018, at the suggestion of Louay Hussein, who operates Nationwide, in an effort to get Nationwide's towing permit reinstated.  (*See* ECF No. 214-4.) Christian was accompanied by the same attorneys representing Nationwide here. (*See id.* at PageID. 6799.)  Before the interview, the City had obtained phone records from one of the car thieves with whom Christian had been communicating, which demonstrated that Christian was being untruthful during the interview. When confronted with that evidence, the lawyers accompanying Christian terminated the interview.

In December 2018, Christian also was deposed in the public nuisance action the City filed against Nationwide in state court on June 1, 2018.  (*See* ECF No. 214-5.)  However, he regularly invoked his Fifth Amendment rights and refused to answer questions during the deposition (*see generally id.*) and, again later, during the trial in that action (*see* ECF No. 215-5).

In the present action, after granting Nationwide's motion for partial summary judgment with respect to liability, the Court set a June 30, 2023 deadline for discovery with respect to damages.  The City then served Christian with a deposition subpoena on June 6, 2023, for a June 14 deposition.

Christian's counsel twice requested a brief adjournment of the deposition, which the City agreed to. On June 27, which was two days before the deposition was at last scheduled to occur, the City learned that Christian had hired new counsel. Christian's newly-hired counsel asked the City to again delay the deposition, but the City rejected the request. Neither Christian nor his counsel appeared at the deposition on June 29. The following day, Christian filed the pending motion to quash the subpoena and for a protective order pursuant to Federal Rules of Civil Procedure 26(c) and 45(d)(3).

Christian argues that he will suffer "undue burden" if his deposition is allowed in this litigation. He maintains that "[e]very single question [the City] would ask [him] has already been asked and answered" and "[t]here is no new information to discover by allowing [the City] to take [his] deposition for a second time." (ECF No. 214-1 at PageID. 6788-89.) According to Christian, "[t]his case has not evolved since [he] provided his [previous] interview and deposition." (*Id.*)

The City responds that Christian's motion is untimely, and he fails to demonstrate "undue burden." The City argues that Christian's deposition is needed to address important facts relevant to its defense based on Nationwide's collusion with car thieves. According to the City, its prior attempts to discover those facts were "stonewalled at every turn." The City maintains that it needs to

7

depose Christian to determine if he will continue to assert his Fifth Amendment

rights.  If Christian plans to invoke his Fifth Amendment rights, the City wants to

know which questions he refuses to answer, which may lead to an argument that

his rights (at least with respect to some questions) are waived.  To the extent

Christian is no longer invoking the Fifth Amendment, or is found unable to invoke,

his rights under that amendment, the City argues that it is entitled to his answers

before trial.

Under Rule 45 of the Federal Rules of Civil Procedure, parties may

command a nonparty to, inter alia, attend and testify at a specified time and place.

Fed. R. Civ. P. 45(a)(1)(A)(iii).  The rule requires a court to quash or modify a

subpoena that "(i) fails to allow a reasonable time to comply; (ii) requires a person

to comply beyond the geographical limits specified in Rule 45(c); (iii) requires

disclosure of privileged or other protected matter, if no exception or waiver

applies; or (iv) subjects a person to undue burden."  Fed. R. Civ. 45(d)(3)(A).

Similarly, Federal Rule of Civil Procedure 26 allows a party or any person from

whom discovery is sought to seek a protective order to avoid, inter alia, "undue

burden[.]"  Fed. R. Civ. P. 26(c)(2).

Rule 45(d)(3)(A) requires the "timely" filing of a motion to quash a

subpoena, *see* Fed. R. Civ. P. 45(d)(3)(A), and "[i]t is well settled that, to be

timely, a motion to quash a subpoena must be made prior to the return date of the subpoena," *FTC v. Trudeau*, No. 5:12MC35, 2012 WL 5463829, at *3 (N.D. Ohio Nov. 8, 2012) (quoting *Estate of Ungar v. Palestinian Auth.*, 451 F. Supp. 2d 607, 610 (S.D.N.Y. 2006)).  While Rule 26(c) does not expressly state that a motion for protective order must be "timely" filed or filed within some other time frame, courts have found a waiver of discovery objections not raised before the deadline for responding.  *See, e.g., Drutis v. Rand McNally & Co.*, 236 F.R.D. 325, 336-37 (E.D. Ky. 2006); *United States v. Thody*, No. 1:19-cv-3392020 13553263, at *1 (W.D. Mich. Sept. 30, 2020) (citing cases).

Christian's motion is not timely.  Nevertheless, courts have considered untimely objections to a subpoena "in unusual circumstances and for good cause shown."  *Schnatter v. 247 Grp., LLC*, 343 F.R.D. 325, 330 (W.D. Ky. 2022) (quoting *Maysey v. Henkel Corp.*, No. 1:17-cv-00108, 2018 WL 314859, at *2 (W.D. Ky. Jan. 5, 2018) (quoting *Trudeau*, 2012 WL 5463829, at *3)).  The Court finds it unnecessary to decide whether such circumstances are present here because Christian fails to demonstrate that he will suffer an "undue burden" by being deposed here.

While Christian was interviewed by the DPD and deposed in the state-court litigation, his attorneys prematurely terminated the interview, and he invoked his

9

Fifth Amendment rights in response to many questions during the deposition. The City is entitled to explore questions that were not answered before and that have developed since. The state-court litigation and the present matter are not identical, and it is likely that the City has developed and discovered new evidence which was not available when it previously questioned Christian. The Court need not accept Christian's assertion that the City has all the relevant information it needs to defend against Nationwide's claimed damages.

The Court rejects any assertion that the deposition will be a waste of time because Christian will invoke his Fifth Amendment rights. It is generally inappropriate to invoke the Fifth Amendment in response to every question. *See In re Morganroth*, 718 F.2d 161, 167 (6th Cir. 1983) ("A blanket assertion of the privilege by a witness is not sufficient to meet the reasonable cause requirement and the privilege cannot be claimed in advance of the questions."). Until the City asks its questions, there is no way to know whether and for which questions Christian will now invoke his Fifth Amendment rights. Only then can this Court assess whether Christian's invocation of the privilege is appropriate under the circumstances.

For these reasons, the Court is denying Christian's motion to quash and for a protective order.

10

### III.    Motion to for Leave to File Second Motion for Summary Judgment (ECF No. 222)

As indicated, the deadline for the parties to file additional dispositive motions concerning damages was June 1, 2023.[2]  Almost two months later, on July 31, Nationwide filed a second dispositive motion (ECF No. 221) followed by a motion for leave to file that motion (ECF No. 222).  Nationwide contends that it could not have filed the motion until it deposed the City's designee on June 19.  If the Court declines to consider the motion as one for summary judgment, Nationwide asks that it be construed as a motion in limine to preclude the City from introducing evidence acquired after its towing permit was terminated on July 19, 2017.

A district court may modify a scheduling order for "good cause."  Fed. R. Civ. P. 16(b)(4); *see also Andretti v. Borla Performance Indus., Inc.*, 426 F.3d 824, 830 (6th Cir. 2005) (analyzing a motion for leave to file a dispositive motion after the deadline in a scheduling order as a motion to modify the scheduling order under Rule 16(b)(4), as opposed to a motion for late filing under Rule 6(b)).  "The

---

[2] As also indicated, the deadline for conducting additional discovery was June 30, 2023.  The Court cannot recall now why the discovery deadline followed the dispositive motion deadline.  These dates were set, however, during a status conference with the parties' counsel.  Likely, the parties expressed a need for discovery unrelated to the anticipated dispositive motions and proposed this order. In any event, there never was an objection to these dates.

11

primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002) (internal quotation marks omitted).  The court also should consider any possible prejudice to the non-movant.  *Id*.

While Nationwide claims it could not have filed its delayed dispositive motion until the June 19 deposition of Commander Parish, this is not supported by the motion, itself.  The proposed motion refers to only three pieces of information shared during the deposition: (1) that Nationwide was not afforded a hearing because the City's law department deemed the permits invalid; (2) the City began providing towing companies with due process hearings before the BOPC after this Court's August 2018 decision; and (3) that the BOPC extended the permit expiration dates for towers an additional six months.  (*See* ECF No. 221 at PageID. 7605-06.)  However, this information has no bearing on the legal arguments in the motion—that the after-acquired evidence doctrine is inapplicable here to enable the City to reduce its damages.  Additionally, Nationwide already was aware of the information.  (*See id*. at PageID. 7604-06 (citing ECF No. 243 at PageID. 503-04 and ECF No. 119 at PageID. 4092).)

12

Moreover, over a year ago, on March 14, 2023, this Court issued a decision holding that Nationwide's compensatory damages could be limited by evidence showing fee-related fraud while Nationwide was acting as a DPD tower, if this misconduct also justified the City's decision to terminate Nationwide's towing permit, even if the evidence of the fraud was only discovered afterward. (ECF No. 204 at PageID. 6540-41.) The Court relied on *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 361-62 (1995). Nationwide did not seek reconsideration in response. Its proposed motion—whether viewed as one for partial summary judgment or as one to limit evidence at trial—essentially is a severely untimely request for reconsideration of that decision.

For these reasons, Nationwide lacks "good cause" for its delayed motion attacking the applicability of *McKennon* and the after-acquired doctrine in this case. Moreover, Nationwide has made the same arguments in response to the City's now-pending summary judgment motion. (*See* ECF No. 216 at PageID. 7024-27.) The Court is denying Nationwide's motion for leave to file its untimely second summary judgment motion and is striking the motion.

IV.   **City's Summary Judgment Motion (ECF No. 211)**

A.   **Applicable Standard**

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Id*. at 323.  Once the movant meets this burden, "[t]he party opposing the motion must show that 'there is a genuine issue for trial' by pointing to evidence on which 'a reasonable jury could return a verdict' for that party." *Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021) (quoting *Liberty Lobby*, 477 U.S. at 248).  The non-movant's evidence generally must be accepted as true and "all justifiable inferences" must be drawn in the non-movant's favor.  *Liberty Lobby*, 477 U.S. at 255.

14

**B.     Factual and Procedural Background**

The Court presumes familiarity with the facts set forth in its earlier decisions

in this case.  (*See* ECF Nos. 119, 179.)  It discusses only those additional facts

relevant to the issues raised in the City's motion.

On July 19, 2017, the City suspended Nationwide from its towing rotation.

(*See* ECF No. 148-2 at PageID. 4777.)  The suspension followed at least a year of

suspicion that Nationwide's recovery of stolen vehicles "at an alarming rate" was

due to its collusion with car thieves.  (*See* ECF No. 148-5 at PageID. 4871-72.)

Commander Parish concluded that Nationwide's recovery of a white 2017 Jeep

Cherokee on July 15, 2017, 14 minutes after it had been stolen, and with its tires

already stripped, provided "sufficient evidence that [it] ha[d] been involved or at

least complicit in the theft of vehicles."  (*Id.* at PageID. 4875.)  He, therefore,

recommended further investigation into Nationwide's activities and its immediate

suspension from DPD's list of authorized towing companies.  (*Id.*)  After the

Assistant Chief of Police and Police Chief concurred in the recommendation, an

"Administrative Message" was issued, suspending Nationwide from the towing

rotation.  (ECF No. 148-2 at PageID. 4777.)

As discussed further below, the City subsequently acquired more

information concerning Nationwide's—or at least one of its employee's—

15

collusion with car thieves.  The City also learned that Nationwide had been charging unauthorized towing fees.

### 1.    Excessive Fees

The Detroit City Council set the fees authorized towing companies were permitted to charge, and excess fees and costs were expressly proscribed.  (ECF No. 211-2 at PageID. 6587, ¶ 3.)  The allowed fees included a flat rate towing fee of $125 for vehicles under 10,000 pounds, a $75 administrative fee to be remitted to the City, and a $15 per day storage fee.  (*Id*.)

Prior to July 2017, Commander Parish, who oversaw DPD towing, received complaints that Nationwide was charging excessive fees.  (*Id*. at PageID. 6587-88, ¶ 5.)  At the time, Commander Parish was uncertain whether the complaints related to tows Nationwide performed for DPD or the Wayne County Sheriff, as it was authorized to tow for both.  (*Id*.)  On July 26, 2017, however, Commander Parish received a memo from a DPD officer describing two complaints regarding excessive fees charged by Nationwide in connection with tows pursuant to its DPD permit.  (*Id.* at PageID. 6588-89, ¶ 5.)

The first complaint related to an individual visiting the City from out of town, whose vehicle had been stolen on February 23, 2017, and recovered by Nationwide.  (*Id*.)  Nationwide presented the owner with a $700 bill when he or

16

she went to retrieve the vehicle.  However, Nationwide told the owner the bill

would be waived if the vehicle was sent to a specific collision shop for repair—a

shop owned by Nationwide's owner, Sam Hussein.  (*Id.*)  The owner elected to

take the vehicle to a Ford dealership, but Nationwide initially refused to release the

vehicle.  (*Id.*)  It did so after the owner paid the $700 bill.  (*Id.*)

The second incident involved a vehicle stolen on June 19, 2017.  (*Id.*)

Nationwide initially told the owner the tow charges would be $750, which the

owner said she could not pay.  (*Id.*)  When the owner later returned, she was told

the charges had increased to $1,000.  (*Id.*)  When the owner said she could not

afford the charges, Nationwide ultimately allowed her to retrieve the vehicle for

$650.  (*Id.*)

By the time Commander Parish received this information—which confirmed

his prior suspicions that Nationwide was charging excessive fees—the City had

already terminated Nationwide's towing permit.  (*Id.* at PageID. 6589, ¶ 8.)

Commander Parish subsequently conducted a formal audit of Nationwide's towing

invoices in February 2018.[3]  The audit verified that, while it held the DPD permit,

---

[3] Commander Parish instituted regular audits of DPD towers when he began
overseeing towing in late December 2016.  (ECF No. 211-2 at PageID. 6587, ¶ 4.)
He recalled at least one previous audit of Nationwide.  (*Id.*)  According to
Commander Parish, the February 2018 audit of Nationwide would have happened

Nationwide routinely charged unlawful and fraudulent tow fees, often three or more times the charges allowed.  (*Id*. at PageID. 6589-90, ¶ 9; *see also* ECF No. 211-2 at PageID. 6604-32.)  This included $225 for the tow, when a flat rate of $125 was permitted.  (ECF No. 211-2 at PageID. 6589-90, ¶ 9.)  It also included an administrative fee $100 more than the $75 owed to the City, which Nationwide retained.  (*Id*. at PageID. 6590, ¶ 10.)  Nationwide also routinely charged $20 per day for storage, as opposed to the $15 allowed.  (*Id*. ¶ 11.)

The charges reflected on the audit are not limited to those Nationwide performed under the DPD permit.  (*See* ECF No. 217-18 at PageID. 7534-35, ¶¶ 8-13.)  According to Nationwide, of the 806 vehicles included in the audit, 206 were towed under the authority of other law enforcement agencies.  (*Id*. at PageID. 7535, ¶ 13.)  Those tows were not subject to the City's Towing Rules or towing rates.  (*Id*. at PageID. 7534, ¶ 10.)  Nevertheless, for some of those tows, the audit contains an "N" to indicate that Nationwide was not in compliance with those rules.  (*Id*. at ¶ 8.)  Nationwide maintains that after subtracting those vehicles, along with vehicles with no charges or charges for additional tows or services a customer "may have requested" (e.g. window wrap), 145 vehicles show

---

sooner in light of the concerns regarding its practices, but other issues and limited City resources got in the way.  (*Id*. at PageID. 6588, ¶ 8.)

overcharges.  (ECF No. 216 at PageID. 7016; *see also* ECF No. 217-18 at PageID. 7535, ¶ 13.)  The 145 vehicles were towed during DPD's stolen recovery pilot program.  (*Id.*)  Nationwide contends that it was allowed to charge for additional services at that time.  (*Id.*)

In the state-court litigation, however, the trial judge found that Nationwide was charging more than the City ordinance authorized, even during the pilot program.  (ECF No. 211-5 at PageID. 6689-90.)  The court also concluded that Nationwide routinely charged impermissible towing and storage fees "on almost every case."  (*Id.* at PageID. 6710.)

Other DPD towers charged fees for additional services, such as "loader," "gate," and "tow out" fees—at least until Commander Parish issued a letter on December 30, 2019, warning DPD-authorized towing companies that they were strictly prohibited from assessing such fees.  (ECF No. 217-5 at PageID. 7307.)  For example, Commander Parish was aware of a few instances where L.L.J.B.S Towing & Recovery charged fees for services not authorized under the Towing Rules (*see* ECF No. 217-12; ECF No. 217-3 at PageID. 7100), although the company's owner informed Commander Parish that these were clerical errors caused by the tows being miscategorized in its system (ECF No. 217-3 at PageID. 7100-91).  Commander Parish testified that he also was told of unauthorized fees

19

being charged by Elite Towing, H&B Land, New Executive Towing, and Michigan Auto Recovery Service ("MARS").  (*Id.* at PageID. 7100-104.)  Additionally, the City learned that New Executive was keeping two sets of books and records, and was told that H&B Land was doing the same.  (*Id.* at PageID. 7104.)

An audit of New Executive reflected it was charging proper fees; however, the company was removed from the DPD towing rotation when it subsequently came to light that it had two sets of books and its representatives admitted wrongdoing.  (ECF No. 225-2 at PageID. 7736. ¶¶ 55-56.)  Audits of Elite Towing and H&B were shelved for various reasons, including COVID.  (ECF No. 225-2 at PageID. 7737, ¶ 57.)  However, Commander Parish did ask DPD tow personnel to investigate both companies in response to information that they were overcharging and was not advised of any issues.  (*Id.*)  Commander Parish was told that H&B had two sets of books and records only a week before his deposition in this litigation on June 19, 2023.  (*Id.* ¶ 59; ECF No. 217-3 at PageID. 7104.)  During the deposition, Commander Parish indicated that he was confirming the accuracy of this information and H&B would be terminated as a DPD tower immediately if the allegations were confirmed.  (ECF No. 225-2 at PageID. 7737, ¶ 59.)

An audit of MARS, which was shared with Commander Parish on May 11, 2020, revealed several instances of charging "presumptively improper" fees:

"loader" fees, a "2nd tow" fee, and a "labor charge".  (ECF No. 217-6; ECF No. 217-7; ECF No. 217-3 at PageID. 7170-80.)  Most of the charges preceded Commander Parish's December 30, 2019 warning letter.  (*See* ECF No. 217-6.)  These fees may be proper with the vehicle owner's consent.  (ECF No. 225-2 at PageID. 7772, ¶¶ 8, 10.)

Detroit's Office of Inspector General ("OIG") reviewed MARS' fee charging practices and initially found "a pattern of MAR[S] charging additional fees without any justification."  (ECF No. 217-10 at PageID. 7474.)  The OIG ultimately concluded, however, "that all non-authorized fees were for private tow services distinct from DPD tows," and, when most of the fees were charged, it was "unclear if [the City's Towing Rules] prohibited non-authorized fees from appearing on DPD invoices, rather than prohibiting non-authorized fees from being assessed in relation to DPD tows."  (*Id.* at PageID. 7476.)

MARS was instructed that, going forward, it is a violation to combine approved DPD tow fees and fees associated with private tows on the same invoice.  (ECF No. 217-10 at PageID. 7474.)  The OIG found that MARS instituted a new invoicing procedure to address this issue.  (*Id.*)  The OIG recommended that DPD implement a clear written policy for all towers, requiring secondary tow activity to be invoiced separately.  (*Id*. at PageID. 7476-77.)

21

Following the OIG's investigation, Commander Parish recommended to the BOPC that MARS towing permit be terminated based on the unauthorized charges, as well as the following additional violations: (1) towing vehicles without authorization from DPD's dispatch center;[4] (2) subcontracting with non-authorized towers to perform DPD tows;[5] and (3) providing false, misleading, or contradictory information to him or the Office of Inspector General to conceal its improper conduct.[6]  (ECF No. 217-9.)  The BOPC elected, instead, to issue a 30-day suspension.  (ECF No. 217-3 at PageID. 7218.)

---

[4] MARS and another tower, V & F, were obtaining tows directly from a DPD officer, in circumvention of the dispatch center.  (ECF No. 225-2 at PageID. 7727, ¶ 25.)  It was determined that MARS obtained far fewer tows in this manner than V & F.  (*Id*. ¶ 26.) V & F's towing permit was suspended.  (*See id.* at PageID. 7734, ¶ 45.)  Its permit subsequently was terminated when the City learned that a V & F employee stole a laptop from a vehicle towed to its lot.  (*Id.* ¶ 46.)  In the state court litigation, the court found that Nationwide operated outside the DPD towing rotation, by directly summoning a Wayne County Sheriff Deputy, at a rate far exceeding that of V & F, and that this conduct constituted a public nuisance.  (*See* ECF Nos. ; ECF No. 225-2 at PageID. 7729-30, ¶¶ 33-35.)

[5] Commander Parish indicates that this was not the primary complaint against MARS because the City's rules on subcontracting were not clear at the time, and the conduct did not cause public harm.  (ECF No. 225-2 at PageID. 7721, ¶ 2.)

[6] The OIG also investigated these other violations, and its findings and conclusions are contained in its report.  (*See* ECF No. 217-10.)

### 2.     Collusion with Car Thieves

As far as Commander Parish is aware, neither MARS nor any other

authorized DPD tower, except Nationwide, engaged in collusion with car thieves.

(ECF No. 225-2 at PageID. 7731, ¶ 36.)  The state court found that at least one

Nationwide employee, Christian, "was receiving tips from a known car thief,

[Maurice Leggette] Cochran."  (*Id.* at PageID. 6696).  In its decision affirming the

trial court's decision, the Michigan Court of Appeals wrote:  "[T]he parties do not

contest the trial court's finding that at least one of Nationwide's drivers, Kenneth

'Turbo' Christian, 'clearly' paid individuals he knew to be car thieves for tips

regarding where stolen vehicles could be located."  *City of Detroit v. Nationwide*

*Recovery, Inc.*, No. 348814, 2021 WL 1051247, at *9 (Mich. Ct. App. Mar. 18,

2021).

This finding was based in part on Nationwide's recovery of a Jeep Cherokee

on July 28, 2017, while DPD was conducting surveillance during the investigation

of a car thief gang.  (ECF No. 211-5 at PageID. 6699.)  Christian arrived to tow the

vehicle five minutes after gang members stole it.  (*Id.*)

Cochran, one of the members, was arrested in October 2017, at which time

two cell phones were recovered from him.  (*Id.* at PageID. 6695.)  On one cell

phone, there was a text to someone identified as "T," at a number associated with

23

Christian.  (*Id.*)  In one text message, Christian instructed Cochran:  "Come back and get your money, Dillhole[.]"  (*Id.*)  Christian's phone records showed more than 400 interactions with Cochran from August through December 2017.  (ECF No. 211-5 at PageID. 6698.)

During his DPD interview in March 2018, Christian acknowledged receiving a tip from car thieves in connection with his recovery of the Jeep Cherokee on July 28, 2017.  (ECF No. 176-2 at PageID. 5655-56.)  He also indicated that he had been receiving tips from car thieves since early July 2017, and that the tip that led to the recovery on July 28, was the third he had received.  (*Id.* at PageID. 5658, 5666-67.)  Forensic information obtained from Cochran's phone reflected that the first communication between Cochran and Christian was on July 27, 2017.  However, documents obtained during the state-court litigation revealed that Christian had recovered 36 vehicles in the first 16 days of July.  (ECF No. 211-2.)  By the end of the month, he had recovered a total of 55 stolen vehicles, roughly 13 per week.  (*Id.*)

According to Commander Parish, Christian's collusion with car thieves and Nationwide's charging of excessive fees merited immediate termination of Nationwide's towing permit.  (ECF No. 211-1 at PageID. 6590-92, ¶¶ 12, 16; ECF No. 217-3 at PageID. 7200-04.)  Christian's conduct of communicating with car

thieves to locate stolen vehicles, Commander Parish provided, violates Michigan's criminal statute for receiving or concealing stolen property. (*See* ECF No. 217-3 at PageID. 7200 (referring to Mich. Comp. Laws § 750.535(1); *see also* ECF No. 225-2 at PageID. 7731, ¶ 38.) He further provides that, had Nationwide's permit not already been revoked when confirmed evidence of its excessive fees and collusion were uncovered, its permit would have been immediately terminated based on this misconduct. (ECF No. 211-1 at PageID. 6590-92, ¶¶ 12, 16.)

Under the City's Towing Rules, "[t]he City reserves the right to terminate any towing permit with a towing company in the event of a breach of the towing permit or any provision of the towing permit or of [the Towing Rules]" and "may immediately terminate any towing permit with a towing company for fraud or criminal conduct by the tow company or its employees[.]" (ECF No. 186-2 at PageID. 5997-98.) While a permit holder has the right to a hearing "before the [BOPC] or [its] designee prior to the effective date of any such termination" (*id*.), as "towing monitor" under the City's Towing Rules from December 2016 until June 2021, Commander Parish had the authority to recommend that a towing company be suspended or terminated (*See* ECF No. 186-2 at PageID. 5996-97; ECF No. 217-3 at PageID. 7052, 7112.)

25

### 3.      Nationwide's Disqualification as a City Vendor

In early 2018, the City began a proposal process to replace its tow permits with contracts.  (ECF No. 225-2 at PageID. 7737, ¶ 62.)  Nationwide applied for a contract.  (*Id.* at PageID. 7738, ¶ 63.)  Due to its concerns regarding Nationwide, DPD referred the issue of whether Nationwide should be considered for a City contract to the OIG.  (*Id.*)

On April 13, 2018, the OIG sent a letter to the City's Mayor, Michael Duggan, preliminarily recommending that Nationwide not be considered for a towing contract.  (ECF No. 225-7 at PageID. 7879.)  The recommendation was based on DPD's ongoing criminal investigation of Nationwide's practices, which had already uncovered instances of at least one principal of Nationwide towing a stolen vehicle after receiving a tip from an alleged car thief.  (*Id.* at PageID. 7879-80)  Nationwide was afforded a hearing to present evidence and testimony to refute the allegations.  (*See* ECF No. 225-8 at PageID 7882.)  The OIG nevertheless continued to have concerns about Nationwide's qualification as a DPD vendor. (*Id.*)  It, therefore, informed Mayor Duggan in a second letter that its "recommendation stands" that Nationwide's bids for towing contracts not be considered.  (*Id.*)

On September 6, 2018, the OIG sent another letter to Mayor Duggan to clarify its previous two letters.  (ECF No. 225-9 at PageID. 7885.)  Specifically, the OIG explained that when it found Nationwide unqualified to bid for the towing contracts, Nationwide's towing permit already had been suspended.  (*Id.*)  Had Nationwide's permit not been suspended already, the OIG indicated it would have recommended immediate suspension for reasons which included the reason it recommended the suspension of several other towing companies.  (*Id.*)

## C.    Applicable Law & Analysis

The City argues that Nationwide's recovery for the violation of its procedural due process rights should be limited to nominal damages because Nationwide was colluding with car thieves and charging grossly excessive and unlawful fees well before its towing permit was terminated.

As this Court previously discussed, there are two inquiries when assessing whether compensatory damages should be awarded for a procedural due process violation.  "The first inquiry concerns causation; whether the action taken without due process is justified or, in other words, whether the same action would have been taken even if due process had been afforded."  *Franklin v. Aycock*, 795 F.2d 1253, 1263 (6th Cir. 1986) (citing *Carey v. Piphus*, 435 U.S. 247, 263-64 (1978)).  "The second inquiry is whether there was proof of actual injury, . . . caused by the

denial of due process, to support an award of compensatory damages[.]" *Id*.
Where a defendant can prove that the same action would have been taken even if
the plaintiff had been afforded due process, the plaintiff is entitled to recover only
nominal damages. *Id.* At 1264 (citing *Carey*, 435 U.S. at 260); *see also id.* At
1263 ("[O]nce it is determined that a claimant's due process rights were violated,
'the burden of proof shifts to the defendant[] to demonstrate that the procedural
violation did not cause the plaintiff's injury.").

At least two years ago, the parties told this Court, that, when addressing the
first inquiry, "[e]vidence that proves that Nationwide or its employees took tips
from or paid car thieves on or prior to July 19, 2017 is admissible and relevant,
*even if that evidence was unknown to the City* at the time of the July 19, 2017
permit revocation decision." (*See* ECF No. 179 at PageID. 5903-04 (citations
omitted).) "As such," the parties agreed, "evidence available on or prior to July
19, 2017, even if unknown to the City at that time, is admissible and relevant to
decide whether the City would have made the same decision had it afforded
Nationwide a hearing." (*Id*. At PageID. 5904.) The Court found this to be a
correct assessment of the law. (*See id*.)

The Court then found insufficient evidence as of the date Nationwide's
permit was terminated to find that Nationwide or one of its employees was paying

car thieves for tips to locate stolen vehicles.  (*See id.* At PageID. 5905-08.)  While there was no disputed fact that at least one Nationwide employee, Christian, was "in contact" with car thieves before Nationwide's permit was terminated, the evidence was inconclusive that Christian was receiving tips *and* paying car thieves before the recovery of the Jeep Cherokee on July 28.  (*Id*. At PageID. 5905-06.)

The Court reconsiders whether proof of payment is necessary because, as Commander Parish describes, a towing company aids in the concealment of a vehicle's theft and the destruction of potential evidence of other crimes simply by receiving tips from car thieves regarding the location of stolen vehicles and towing those vehicles without going through the proper DPD channels.  (*See* ECF No. 217-3 at PageID. 7201-03.)  The state court found this conduct to be a public nuisance.  (*See generally* ECF No. 211-5.)  The state court found that Nationwide had been working outside the DPD rotation system well before July 2017.  (*Id.*)

By at least the beginning of July 2017, Christian was interacting with car thieves.  In the first 16 days of the month, he recovered 36 stolen vehicles.  Based on Commander Parish's experience with towing, this rate of recovery was impossible without the assistance from car thieves.  (ECF No. 211-2 at PageID. 6595, ¶ 28.)  While Christian claimed that he did not pay the car thieves for their tips, the record indicates otherwise.  In fact, the state trial and appellate courts

already have concluded that Christian " 'clearly' paid individuals he knew to be car thieves for tips regarding where stolen vehicles could be located." *See Nationwide Recovery*, 2021 WL 1051247, at *9.  The City may not have evidence of tips or payments prior to July 19 as undeniably incriminating as the text from Christian to Cochran on October 12, 2017, where Christian told Cochran to come get his money.  But there is no genuine issue of material fact that Christian, while working as a Nationwide tower, colluded with car thieves before July 19.

Moreover, the evidence is conclusive that Christian was paying for tips from car thieves as of July 28—just over a week after Nationwide's towing permit was terminated.  There are two reasons why the Court now believes it can consider this evidence when deciding whether Nationwide's recovery should be limited to nominal damages.  First, "[p]rocedural due process rules are meant to protect persons not from the deprivation, but from the *mistaken or unjustified* deprivation of life, liberty, or property."  *Carey*, 435 U.S. at 259 (emphasis added).  "[P]rocedural due process rules are shaped by the risk of error inherent in the truth-finding process[.]"  *Id*. (quoting *Matthews v. Eldridge*, 424 U.S. 319, 344 (1976)).  Where the decision was correct or justified, the Supreme Court has reasoned, the fact that a due process violation may have occurred should not produce a windfall.  *Id*. at 260.  Second, had a hearing been conducted "as soon as practicable"—which

30

the record reflects would have been months after July 17 (ECF No. 225-2 at PageID. 7741, ¶ 79)—any existing relevant evidence, such as the July 28 incident, would have been presented to and considered by the BOPC.[7]

Based on his experience in towing and with the BOPC, Commander Parish indicates that the collusion between a Nationwide employee and car thieves merited immediate termination. Supporting this result, the OIG also concluded, preliminarily *and after affording Nationwide a hearing*, that Nationwide was not qualified to serve as a City vendor based on this misconduct. Nationwide fails to show that this type of misconduct would not have warranted a towing company's immediate termination.

Moreover, Nationwide *has been afforded* a trial before the state court and a hearing before the OIG with respect to its misconduct. The state court found that a Nationwide employee was "clearly" colluding with car thieves—paying tips for locations of stolen vehicles which incentivized car thieves to steal vehicles and dump them in the City. (ECF No. 211-5 at PageID. 6696.) The state court also

---

[7] Even if the July 28 incident cannot be factored into the assessment of whether Nationwide's permit would have been terminated if a hearing had been afforded (which, to be clear, the Court does not believe to be the case), it is relevant to whether Nationwide's damages should be cut off once that incident happened. At most, therefore, Nationwide would be entitled to damages equivalent to what it would have earned during the 11 days between when its permit was terminated and when a Nationwide tower was caught in the act of colluding with car thieves.

found that Nationwide routinely charged impermissible towing and storage fees "on almost every case."  (*Id*. at PageID. 6710.)

Even if this latter finding does not warrant a nominal damages award—as it provides a different reason for terminating Nationwide's permit than the one on which the decision was based—it should limit Nationwide's recovery as the misconduct was occurring before the permit was terminated, even if the City had not uncovered the proof.  *See McKennon*, 513 U.S. at 360-61. ("Once an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information, even if it is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit.  The beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered."); *see also Carey*, 435 U.S. at 260 (indicating that wrongdoers should not recover a windfall simply due to the lack of procedural due process).  There were suspicions that Nationwide was charging excessive fees well before July 19, 2017, when its permit was terminated.  The undisputed evidence reflects that two memos received by Commander Parish less than a week after Nationwide's termination confirmed those suspicions.  (*See* ECF No. 211-1 at PageID. 6589, ¶ 8.)  Nationwide fails to

32

present evidence to refute Commander Parish's assertion that this behavior also warranted the immediate termination of Nationwide's DPD permit.

Nationwide's misconduct is not comparable to MARS.  First, there is no suggestion in the record that MARS or one of its employees was paying for tips from car thieves to secure a rate of recovery beyond most DPD towers.  In fact, there is no indication that any other DPD tower was colluding with car thieves. Second, MARS was found to have charged for extra services for which there was some lack of clarity as to whether they could be charged or, if charged, included on the same invoice as the services allowed under DPD Towing Rules.  Nationwide, in comparison, was inflating the allowable fees, charging vehicle owners substantially more than the amount permitted under the Towing Rules.[8]  This included an $175 administrative fee, when the City only allowed and was reimbursed $75.

For these reasons, the Court concludes that the City is entitled to summary judgment with respect to whether Nationwide is limited to nominal damages.

---

[8] The City's reply brief reflects that this finding holds true despite Nationwide's challenges to the 2018 audit.  (*See* ECF No. 225 at PageID. 7709.)

## VII.   Conclusion

For the reasons stated above, the Court is denying Nationwide's motion to strike (ECF No. 218) paragraph 12 of Commander Parish's declaration attached to the City's motion for summary judgment.  It also is denying the motion to quash the subpoena for, or for a protective order related to, Christian's deposition (ECF No. 214), although the need for the deposition is presumably rendered moot by the decision on the City's summary judgment motion.  Finding a lack of good cause for Nationwide's late-filed second summary judgment motion, and that the arguments in the motion are set forth elsewhere, the Court denies Nationwide's motion for leave to file the motion (ECF No. 222) and strikes the already-filed motion (ECF No. 221).  The Court concludes that the City is entitled to summary judgment with respect to Nationwide's entitlement to only nominal damages. (ECF No. 211.)

**SO ORDERED**.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: March 26, 2024